581 F.2d 1374
 UNITED STATES of America, Plaintiff-Appellee,
v.
Dennis Edward PARNELL, Defendant-Appellant.
UNITED STATES of America, Plaintiff-Appellee,
v.
Lacy Lee PARKER, Defendant-Appellant.
UNITED STATES of America, Plaintiff-Appellee,
v.
R. D. BROWN, Defendant-Appellant.
UNITED STATES of America, Plaintiff-Appellee,
v.
Larry G. WYCHE, Defendant-Appellant.
UNITED STATES of America, Plaintiff-Appellee,
v.
Kenneth M. GUNNING, Defendant-Appellant.
UNITED STATES of America, Plaintiff-Appellee,
v.
James R. LEATHERS, Defendant-Appellant.
UNITED STATES of America, Plaintiff-Appellee,
v.
Jarrel H. COX, Defendant-Appellant.
 Nos. 77-1334 to 77-1340.
 United States Court of Appeals,
Tenth Circuit.
 Submitted on the Briefs May 8, 1978.
Decided July 24, 1978.
Rehearing Denied in No. 77-1340 Sept. 20, 1978.
 
 1
 Hubert A. Marlow, U. S. Atty., Hubert H. Bryant, Asst. U. S. Atty., Tulsa, Okl., for plaintiff-appellee.
 
 
 2
 Jim H. Heslet, Tulsa, Okl., for defendants-appellants Parnell and gunning.
 
 
 3
 William R. Grimm, Barrow, Gaddis & Griffith, Tulsa, Okl., for defendants-appellants Parker, Brown and Leathers.
 
 
 4
 Gene Stipe and Robert McCune, Stipe, Gossett, Stipe & Harper, McAlester, Okl., for defendant-appellant Wyche.
 
 
 5
 John C. Humpage, Topeka, Kan., for appellant Cox.
 
 
 6
 Before BARRETT and McKAY, Circuit Judges, and BRATTON, District Judge.
 
 
 7
 BRATTON, District Judge.
 
 
 8
 Appellants take these appeals from criminal convictions for aiding and abetting the interstate transportation of falsely made and forged securities (cashier's checks), in violation of 18 U.S.C. § 2314 and 18 U.S.C. § 2, and conspiracy to commit the substantive offenses, in violation of 18 U.S.C. § 371.
 
 
 9
 Evidence presented at trial established that between April 1 and July 1, 1975, appellants and others engaged in a scheme to purchase grain from granaries in Mississippi, Minnesota, Missouri, Colorado and Kansas, using as payment falsely made and forged cashier's checks drawn on the Union National Bank of Tulsa, Oklahoma. Valid cashier's checks were obtained from the Union National Bank in Tulsa and were later reproduced in blank by a printer. The reproduced instruments were then imprinted in an amount in excess of $1,000 with a check protector machine. In addition, the checks were imprinted with the name of the granary to be defrauded, the date and the false signature of a fictitious bank official. The forged instruments were then turned over to other members of the conspiracy who used them as payment for grain purchases. The grain so purchased was quickly resold to other grain dealers, and the funds acquired divided among the co-conspirators.
 
 
 10
 It was established that a precursor to the conspiracy charged here was a scheme implemented in February and March 1975 by the appellant Dennis Edward Parnell and two confederates, Ralph J. Teenor and Jimmy Culver (both of whom entered guilty pleas to the charges arising from the events in April and May 1975). A checking account was opened in the Broadway National Bank in San Antonio, Texas, and an apartment was rented in that city. Between $2,000 and $3,000 was placed in the account and after a purchase of grain was made using checks drawn on the account, but before the checks were presented for collection, the parties withdrew the funds from the account. The plan evidently was not foolproof, as Jimmy Culver testified: "We did it once and then the second time the man we bought from flew down there and cashed the check, he beat us to the bank." Having concluded that the scheme had some imperfections, Parnell, Teenor and Culver sought advice from the appellant Lacy Parker. As Culver put it, "We were discussing him taking over this account and showing us how to do it, and about that time we came into possession of a cashier's check that someone had taken from a girl." They used this stolen cashier's check to buy grain, and as Culver explained, "That cashier's check went so well that Ralph Teenor and Dennis Parnell came up with a way to get more cashier's checks. We decided to do that." In this manner the conspiracy charged here was born.
 
 
 11
 In April 1975, at Parnell's request, Judy Dianne Nanny Casey purchased a cashier's check for Parnell in a nominal amount at the Union National Bank in Tulsa, Oklahoma. Parnell then found a printer who produced counterfeit blank cashier's checks, purportedly issued by the Union National Bank.
 
 
 12
 Judy Casey also rented an apartment for Parnell at his request in downtown Tulsa, in the name of Dianna Butler. She had a telephone installed in the apartment in Dianna Butler's name. The number of the telephone installed at the apartment was 585-8032.
 
 
 13
 While the testimony revealed a number of separate grain purchases, a transaction typical of those involved in the scheme occurred at the Bigelow Farmers Elevator in Bigelow, Minnesota on May 17 and 19, 1975. In early May the manager of the Bigelow Farmers Elevator had received a telephone call from someone identifying himself as "George Hendricks," who said he wanted to buy corn. A price was quoted and a bargain struck for ten truckloads, which were to be paid for by cashier's check. On May 17 and again on May 19 trucks arrived at the elevator and were filled with corn to Hendricks' order. After the last of the grain was loaded, Ralph Teenor gave the manager of the elevator five cashier's checks totalling $30,000, purportedly drawn on the Union National Bank of Tulsa, showing the purchaser's name as George Hendricks. At the manager's request, Teenor left a telephone number which he said was George Hendricks' number in Tulsa. The number was 585-8032. When the cashier's checks were deposited, they "bounced." An official from the Tulsa Union National Bank testified that those cashier's checks had not been issued by the bank, that the alleged authorized signer was not known to the bank, and that the checks were counterfeit. Ralph Teenor testified that the first load of grain that was purchased in Bigelow on May 17 was later sold to the O'Neill Grain Elevator in North Sioux City and that the second load, purchased on May 19, was sold to the Farmers Elevator in Elk Point, South Dakota. Payment was made to Ralph Teenor, by check. Teenor cashed those checks and paid the cash received to Jimmy Culver. Culver then disbursed the cash to the owners of the trucks, the printer and the drivers.
 
 Sufficiency of the evidence
 
 14
 Each appellant makes the claim that the evidence was insufficient to establish that he participated in or knew of the conspiracy or acted with criminal intent. On appeal, the evidence must be
 
 
 15
 "viewed in the light most favorable to the government to ascertain if there is sufficient evidence, direct or circumstantial, together with the reasonable inferences to be drawn therefrom, from which the jury may find (a) defendant guilty beyond a reasonable doubt."
 
 
 16
 United States v. Butler, 446 F.2d 975, 978 (10th Cir. 1971). Further, the circumstantial evidence required to support a verdict need not conclusively exclude every other reasonable hypothesis and it need not negative all possibilities except guilt. United States v. Henry, 468 F.2d 892, 894 (10th Cir. 1972). An illegal conspiracy is "an agreement between two or more persons to commit one or more unlawful acts, and is complete when one or more of the conspirators knowingly commit an act in furtherance of the object of the agreement." United States v. Thomas, 468 F.2d 422, 424 (10th Cir. 1972), Cert. denied, 410 U.S. 935, 93 S.Ct. 1389, 35 L.Ed.2d 599 (1973). In reviewing a conviction for conspiracy, the question is whether the circumstances, acts and conduct of the parties are of such character that the minds of reasonable men may conclude therefrom that an unlawful agreement existed. Jones v. United States, 251 F.2d 288, 290 (10th Cir. 1958), Cert. denied 356 U.S. 919, 78 S.Ct. 703, 2 L.Ed.2d 715.
 
 
 17
 The evidence was clearly sufficient to establish that Dennis Edward Parnell was a willing participant in the scheme from its inception. He arranged for the rental of an apartment and a telephone in Tulsa, Oklahoma, the number of which telephone was to be used by other members of the conspiracy in the event any of the granaries wanted to contact the fictitious purchasers. Additionally, Parnell found a printer and arranged for the production of counterfeit blank cashier's checks. He also furnished several forged selective service registration cards which were used as identification to facilitate the passing of the forged cashier's checks. Finally, he turned the fake cashier's checks over to the other members of the conspiracy who used them as payment for the grain purchases.
 
 
 18
 As to Lacy Lee Parker, the evidence established that he, too, was a knowing participant in the conspiracy. Parnell, Culver and Teenor turned to Parker for assistance when they realized the deficiency in their original scheme to purchase grain with checks drawn on the account in the San Antonio bank. It was established that on several of the grain purchasing trips Parker used a false name to check in at hotels and then telephoned granaries and arranged the purchase and resale of grain. On a trip to Vicksburg, Mississippi, for example, Parker ordered grain in the name of "Jerry Dickson" and then gave Ralph Teenor an envelope containing several falsely made cashier's checks to purchase the grain he had ordered. In Van Buren, Arkansas, on another grain buying trip, Ralph Teenor cashed a $17,000 check he had received for resale of the grain they had purchased with the cashier's checks, and handed the bulk of the cash to Parker and Culver, who split it between themselves.
 
 
 19
 With respect to Larry G. Wyche, the evidence establishes that he, too, was a willing and knowing participant in the conspiracy. It appears that Wyche undertook the telephone duties as a replacement for Parker, who quit the conspiracy after the Illinois grain buying trip. It was Wyche who made the calls to arrange the purchase of grain in Bigelow, Minnesota, and Wray, Colorado. Wyche also accompanied the group on purchasing trips to Illinois, Minnesota and Colorado. There was testimony that while the group was staying at the Platt Valley Inn in Julesberg, Colorado, Wyche gave Ralph Teenor some of the counterfeit cashier's checks and told him to go to Wray, Colorado to purchase a load of grain. In addition to arranging the purchase of grain, it appears that Wyche also participated in the scheme and profited from it, by permitting his trucks to be used to haul the grain.
 
 
 20
 Another member of the conspiracy who arranged for grain purchases was the appellant Jarrel H. Cox. The evidence established that Jarrel Cox telephoned the owners of granaries in Rushville, Missouri and Topeka, Kansas, and arranged to purchase grain from them. The owners of both granaries testified that the person to whom they spoke on the telephone to arrange the sales identified himself as "Max Holloway." Jarrel Cox was further involved in the scheme as a truck driver on the trip to Rushville, Missouri, and to Topeka, Kansas, though there is some confusion in the testimony as to whether it was Jarrel Cox or his brother, Jim Cox, who drove on the Topeka trip. At any rate, several days after the Topeka purchase Jarrel Cox was paid $500. Culver gave the money to Jim Cox who was to transfer it to Jarrel Cox.
 
 
 21
 As to the appellant Kenneth M. Gunning, the evidence clearly established his knowing participation in the conspiracy. Both Jimmy Culver and Milton Steven McGugin, another co-conspirator, testified that they specifically informed Gunning of the illegal nature of the plan before Gunning joined them. Culver told Gunning that they were buying grain with counterfeit cashier's checks. Knowing this fact, Gunning still wanted to participate in the enterprise by driving one of the trucks. He was permitted to join and he drove a truck to Topeka, Kansas, where he and several other drivers signed false names to bills of lading at the Far-Mar-Co grain elevator and picked up a load of grain. It is Gunning's claim that he abandoned the conspiracy after he picked up that load of grain. He asserts that he drove his truck away from the granary, parked at the side of the road before reaching his destination, and simply left it there. There was sufficient evidence to establish, however, that in fact Gunning drove his grain-laden truck to its destination and afterwards accepted $400 from Culver for his part in the operation.
 
 
 22
 The remaining appellants, R. D. Brown and James R. Leathers, were also drivers of trucks used in the purchase and resale of grain. Both drove trucks on the trips to Bigelow, Minnesota and to Nebraska. Leathers admitted using a false name on a bill of lading in the course of one of the purchases, though he said that that was a common practice among drivers making legitimate grain purchases. The evidence established that Brown was paid $600 for his participation in one of the trips. Both Brown and Leathers testified in their own behalf, and each asserted that he did not know that there was anything illegal about the operation.
 
 
 23
 Against this assertion of honest ignorance is Culver's testimony that "everybody there knew it was illegal," made in response to the question whether another truck driver was aware of the illegality of the operation. At another point in Culver's testimony the following exchange took place:
 
 
 24
 Q. Now, and it is your testimony that all of these drivers knew what was going on?
 
 
 25
 A. They sure did.
 
 
 26
 Q. That you took special care to tell them?
 
 
 27
 A. I didn't take special care to tell them.
 
 
 28
 Q. But you told them?
 
 
 29
 A. I told all of them. It was common knowledge what was going on, it was discussed several times over coffee what was going on, how long we could get away with it.
 
 
 30
 While there is a conflict between Culver's testimony and Brown's and Leathers' denials of knowledge, it was the province of the jury to resolve such conflicts and reconcile the testimony if reasonably possible, considering the motives of the witnesses and all other circumstances in the case. McCarty v. United States, 409 F.2d 793, 798 (10th Cir. 1969) Cert. denied 396 U.S. 836, 90 S.Ct. 95, 24 L.Ed.2d 87; Wilcoxon v. United States, 231 F.2d 384 (10th Cir. 1956) Cert. denied, 351 U.S. 943, 76 S.Ct. 834, 100 L.Ed. 1469. On appeal from a conviction the scope of review is limited to determining whether there was substantial evidence to support the verdict. In passing upon the sufficiency of the evidence under that standard an appellate court will not weigh conflicting evidence or consider the credibility of the witnesses. United States v. Weiss, 431 F.2d 1402, 1407 (10th Cir. 1970); Cartwright v. United States, 335 F.2d 919, 921 (10th Cir. 1964).
 
 
 31
 Taken as a whole, substantial evidence, both direct and circumstantial, was presented which, with the reasonable inferences that may be drawn therefrom, is sufficient to establish that each of the appellants willfully and knowingly participated in the illegal scheme charged in the indictment.
 
 Variance
 
 32
 Appellants Parnell and Cox argue that the trial court erred in denying their motion for acquittal at the conclusion of the government's evidence based on a fatal variance between the facts proved and the facts alleged in the indictment. The argument is that the government proved that the cashier's checks used here were counterfeit, while the indictment charged the interstate transport of "falsely made, forged and altered" cashier's checks.
 
 
 33
 The evidence established that the fake cashier's checks passed by appellants were counterfeit. The term "counterfeit" is used when a
 
 
 34
 "fraudulent obligation bears such a likeness or resemblance to . . . genuine obligations or securities . . . as is calculated to deceive an honest, sensible or unsuspecting person of ordinary observation and care dealing with a person supposed to be upright and honest."
 
 
 35
 United States v. Chodor, 479 F.2d 661 (1st Cir. 1973), Cert. denied 414 U.S. 912, 94 S.Ct. 254, 38 L.Ed.2d 151 (1973); United States v. Johnson, 434 F.2d 827 (9th Cir. 1970); United States v. Smith, 318 F.2d 94 (4th Cir. 1963). In another context this court has used the term "counterfeit" to mean "an imitation of an authentic document or writing or a resemblance intended to deceive and to be taken for the original." First Nat. B. & T. Co. of Oklahoma City v. United States F. & G. Co., 347 F.2d 945, 947 (10th Cir. 1965).
 
 
 36
 In like manner, the cashier's checks used by appellants were also falsely made and forged. This court has held that the words "falsely made" and "forged" are homogeneous; "They have always been synonymously construed to describe a spurious or fictitious making as distinguished from a false or fraudulent statement." Marteney v. United States, 216 F.2d 760, 763 (10th Cir. 1954), Cert. denied 348 U.S. 953, 75 S.Ct. 442, 99 L.Ed. 745.
 
 
 37
 The Indictment having charged the interstate transport of "falsely made, forged and altered" securities, and the evidence supporting a finding that the cashier's checks used in the conspiracy charged here were both " counterfeit" and "falsely made" and "forged," there is no variance between the indictment and the proof.
 
 
 38
 It is noted that in prohibiting the interstate transport of "any falsely made, forged, altered or counterfeited security" the statute uses the disjunctive. The indictment here charged appellants in the conjunctive, with aiding and abetting the interstate transport of "falsely made, forged and altered securities." The evidence revealed that the fake cashier's checks were printed in blank to resemble valid cashier's checks drawn on an existing bank and were then inscribed with the names of fictitious purchasers and the purported signatures of non-existent bank officials. While the production of such cashier's checks did not involve the alteration of any existing genuine security, the inclusion of the term "altered" in the indictment works no benefit to appellants. It is well established that where a crime denounced disjunctively in the statute is charged in the conjunctive, proof of any one of the allegations will sustain a conviction. United States v. Gunter, 546 F.2d 861, 868-9 (10th Cir. 1976) Cert. denied 430 U.S. 947, 97 S.Ct. 1583, 51 L.Ed.2d 794; United States v. Pauldino, 443 F.2d 1108, 1112 (10th Cir. 1971), Cert. denied 404 U.S. 882, 92 S.Ct. 204, 30 L.Ed.2d 163.
 
 
 39
 Appellants Parker and Brown raise a separate claim of variance, contending that the indictment charged one conspiracy while the proof established multiple conspiracies. Reliance is placed upon Berger v. United States, 295 U.S. 78, 55 S.Ct. 629, 79 L.Ed. 1314 (1935); Kotteakos v. United States, 328 U.S. 750, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946); United States v. Bertolotti, 529 F.2d 149 (2d Cir. 1975), and United States v. Butler, 494 F.2d 1246 (10th Cir. 1974).
 
 
 40
 The fact that a number of separate transactions may have been involved in this case does not establish the existence of a number of separate conspiracies. The evidence adduced at trial revealed that over a period of two months, appellants and others carried out a single scheme to obtain grain fraudulently for later resale by passing counterfeit cashier's checks. The scheme was accomplished through a series of similar transactions, each of which was of one design and each of which was part of one basic and overriding plan. The separate grain transactions can reasonably be considered as the operations of a going concern, understood by all of the participants to be so, rather than as separate transactions or groups of transactions. See United States v. Nasse, 432 F.2d 1293 (7th Cir. 1970), Cert. denied, sub nom. Tocco v. United States, 401 U.S. 938, 91 S.Ct. 927, 28 L.Ed.2d 217 and David v. United States, 402 U.S. 983, 91 S.Ct. 1657, 29 L.Ed.2d 148; see also United States v. Bastone, 526 F.2d 971 (7th Cir. 1975), Cert. denied, 425 U.S. 973, 96 S.Ct. 2172, 48 L.Ed.2d 797.
 
 
 41
 Some of the participants remained with the enterprise from its inception until it was brought to an end, and others joined or left the scheme as it went along. The participation of each overlapped with the participation of others, however, and this overlap among the individuals, combined with the repeated nature of the operation which the scheme employed, are facts from which the jury could infer that appellants knew they were participating in a larger ongoing conspiracy. See United States v. Cirillo, 499 F.2d 872 (2d Cir. 1974) Cert. denied 419 U.S. 1056, 95 S.Ct. 638, 42 L.Ed.2d 653. The single appellant here who made only one trip was Gunning, and the evidence is clear that he fully understood that he was joining an ongoing conspiracy when he did so. In addition, given the character of the property involved and the nature of the crime, it is a reasonable inference that each participant must have known that the scheme could not achieve its desired end by his action alone. United States v. Morrow, 537 F.2d 120, 126 (5th Cir. 1976), Cert. denied 430 U.S. 956, 91 S.Ct. 1602, 51 L.Ed.2d 806. It is not necessary, of course, that each member in a conspiracy be acquainted with the others, or have knowledge of all of the details of the plan. Blumenthal v. United States, 332 U.S. 539, 557, 68 S.Ct. 248, 92 L.Ed. 154 (1947).
 
 
 42
 The evidence adduced at trial is sufficient to establish that appellants and others were drawn together in a single over-all, comprehensive plan, where all the participants, by reason of their knowledge of the plan's general scope, if not its exact limits, sought a common end, to aid in the purchase and resale of grain using falsely made and forged cashier's checks. Accordingly, there was no variance between the indictment, which charged participation in a single conspiracy, and the proof adduced at trial.
 
 Severance
 
 43
 Appellants Parnell, Gunning and Cox argue that the trial court committed error in failing to grant a severance of each of their trials from the trials of their co-defendants and in refusing to strike the testimony of the alleged co-conspirators at the conclusion of the evidence. These claims are not well taken.
 
 
 44
 First, with respect to the motion to sever, any reliance upon Bruton v. United States, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968) is misplaced. This case did not involve the introduction into evidence of any post-arrest confession by a co-defendant who did not take the stand. The only statements of coconspirators which were admitted against appellants here were made on the witness stand, and each appellant had ample opportunity to cross-examine those witnesses. There was no denial of appellants' Sixth Amendment rights and there was no error in refusing to grant a severance on that basis.
 
 
 45
 Second, with respect to the motion to strike, it is well understood that proof of a conspiracy may not rest alone on out-of-court statements of co-conspirators; there must be some independent evidence that the defendants against whom the statements of co-conspirators are admitted were active participants in the conspiracy. Beckwith v. United States, 367 F.2d 458, 460 (10th Cir. 1966); Dennis v. United States, 346 F.2d 10, 16 (10th Cir. 1965). There was ample evidence, independent of any hearsay admitted, from which the jury could reasonably have concluded that appellants were active and knowing members of the scheme. Accordingly, there was no error in the trial court's refusal to strike the testimony of co-conspirators.
 
 
 46
 Appellant Wyche raises a separate severance argument. It is apparently his claim that there was so little evidence against him and such a welter of evidence as to the activities of large numbers of other persons on trial that the court's failure to sever his trial from his co-defendants' made it very likely that the issue of his guilt was confused with the guilt of the co-defendants.
 
 
 47
 The decision whether to grant a motion for severance rests in the sound discretion of the trial court. United States v. Smaldone, 485 F.2d 1333 (10th Cir. 1973) Cert. denied 416 U.S. 936, 94 S.Ct. 1934, 40 L.Ed.2d 286, rehearing denied 417 U.S. 926, 94 S.Ct. 2635, 41 L.Ed.2d 230, 419 U.S. 888, 95 S.Ct. 163, 42 L.Ed.2d 133. To support a motion for severance a defendant must carry the heavy burden of showing prejudice by the joinder. The mere argument that a separate trial might offer him a better chance of acquittal is insufficient to satisfy that burden. United States v. Tanner, 471 F.2d 128 (7th Cir. 1972) Cert. denied 409 U.S. 949, 93 S.Ct. 269, 34 L.Ed.2d 220. On the pretrial motion for severance Wyche simply failed to offer any evidence indicating that he would be unfairly prejudiced if his motion were not granted. Nor has Wyche made any showing of prejudice on this appeal as a result of the joinder of his trial with that of his co-defendants. In the absence of such showing, the ruling of the trial court was not an abuse of discretion. United States v. Beathune, 527 F.2d 696 (10th Cir. 1975) Cert. denied 425 U.S. 996, 96 S.Ct. 2211, 48 L.Ed.2d 821.
 
 Evidence of other crimes
 
 48
 Appellant Parnell makes the claim that it was error to have allowed Jimmy Culver to testify concerning the San Antonio check scheme which was carried out prior to the conspiracy and events charged in the indictment. Parnell's argument is that this evidence of other crimes was unrelated to the issues of this case.
 
 
 49
 To the contrary, however, the San Antonio check scheme was the direct precursor to the scheme for which appellants were brought to trial. The conspiracy charged in the indictment grew out of and was a refinement upon the earlier operation. Thus Culver's testimony concerning the San Antonio scheme was admissible as proof of motive, intent and the continuation of a common plan. Federal Rules of Evidence, Rule 404(b). As the evidence established that Parnell was deeply involved in both operations, the testimony concerning the San Antonio plan also tended to show knowledge or an absence of mistake on Parnell's part as to the true nature of the cashier's checks. The evidence was properly admitted. See United States v. Nolan,551 F.2d 266, 271-2 (10th Cir. 1977), Cert. denied, 434 U.S. 904, 98 S.Ct. 302, 54 L.Ed.2d 191.
 
 
 50
 Gunning's claim that he abandoned the conspiracy
 
 
 51
 Appellant Gunning asserts that he should have been acquitted of the conspiracy charge because the evidence showed that after picking up a truckload of grain and signing a false name on a bill of lading, he parked the truck beside the road and left it, thus abandoning the conspiracy. The record reveals nothing, however, which would indicate that Gunning withdrew from the conspiracy before he reached his destination. Rather, after he delivered that truckload of grain he was paid $400 for his participation.
 
 
 52
 In order to withdraw from a conspiracy an individual must take affirmative action, either making a clean breast to the authorities or communicating his withdrawal in a manner reasonably calculated to reach co-conspirators. United States v. Dorn, 561 F.2d 1252, 1256 (7th Cir. 1977); United States v. Mardian, 178 U.S.App.D.C. 207, 546 F.2d 973 (1976); United States v. Borelli, 336 F.2d 376, 388 (2d Cir. 1964), Cert. denied 379 U.S. 960, 85 S.Ct. 647, 13 L.Ed.2d 555 (1965). The burden of establishing withdrawal is on the defendant. United States v. Pearson, 508 F.2d 595, 597 (5th Cir. 1975) Cert. denied 423 U.S. 845, 96 S.Ct. 82, 46 L.Ed.2d 66; United States v. Borelli, supra at 388.
 
 
 53
 Appellant Gunning has not met this burden. There was no evidence that he took any action whatsoever to withdraw, other than ceasing participation after the Topeka trip, and mere cessation of activities alone is not enough. United States v. Borelli, id.
 
 Opportunity to object
 
 54
 The final claim is raised by appellant Cox, to the effect that the court did not give counsel opportunity to object to the court's instructions before the jury began its deliberations, contrary to Fed.R.Crim.P. 30. See Hall v. United States, 378 F.2d 349 (10th Cir. 1967).
 
 
 55
 Cox's argument is not supported by the record. At the conclusion of his reading of the instructions, the trial court ordered the marshal to "hold the jury . . . just a moment until I let the defendants make a record." The jury was then excused from the courtroom and the court invited counsel on both sides to state any objections or additions to the instructions as given. Neither the government nor any of the defendants offered any objections or additions. The court then stated,
 
 
 56
 Gentlemen, this is my procedure so you will know. Two things you asked me yesterday, if you will stay within five minutes of call I am going to let the jury start deliberating now.
 
 
 57
 And Marshal, you may so advise them so they can start.
 
 
 58
 This procedure was entirely proper and in compliance with Rule 30. See 2 Wright, Fed. Practice and Procedure § 484 at 287 (1969).
 
 
 59
 Since there was no error, the judgment of the trial court should be affirmed.
 
 
 60
 The judgment is affirmed.