**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**James H. McCONNELL and Raymond
H. Starns, Defendants-Appellants.**

**Nos. 83–1178, 83–1179.**

United States Court of Appeals,
Tenth Circuit.

Dec. 10, 1984.

Stephen P. Learned, U.S. Dept. of Justice, Washington, D.C. (Layn R. Phillips,

U.S. Atty., N.D.Okl., Tulsa, Okl., with him on brief), for plaintiff-appellee.

Morton Berger, Spring Valley, N.Y., for defendants-appellants.

Before SETH, Circuit Judge, DOYLE, Circuit Judge, and BOHANON, Senior District Judge.[*]

BOHANON, Senior District Judge.

James H. McConnell and Raymond H. Starns appeal jury verdicts convicting them on numerous counts of a twenty count indictment. The indictment alleged a conspiracy to commit four separate kinds of substantive offenses against the United States: 1) the use of the mails for fraudulent purposes in violation of 18 U.S.C. § 1341; 2) the use of wire communications transmissions for fraudulent purposes in violation of 18 U.S.C. § 1343; 3) inducing individuals to travel in interstate commerce for the purpose of defrauding such individuals in violation of 18 U.S.C. § 2314; and 4) causing checks to be transported in interstate commerce for fraudulent purposes in violation of 18 U.S.C. § 2314. The defendant McConnell was convicted of conspiracy and all but four of the substantive counts. The defendant Starns was convicted of conspiracy and all but three of the substantive counts.

On appeal the defendants raise three allegations of error, claiming 1) that the trial court improperly denied McConnell's motion for a severance, 2) that the trial court erroneously ruled that if McConnell testified during the trial, the government would be permitted to cross-examine him with respect to certain past wrong-doing and with respect to a statement he made to the F.B.I. in 1974; and 3) that the defendant Starns was deprived of his Sixth Amendment right to counsel by the trial court's denial of his motion for a severance. We find these allegations to be without merit and therefore affirm.

## I. THE FACTS

Both parties on appeal have devoted considerable space in their briefs to summarizations of the testimony at trial. We fail to see, however, that a lengthy rehashing of some 15 volumes of trial transcript is necessary or efficacious for a determination of whether the pretrial rulings here contested were erroneous. With respect to the challenge to the trial court's "ruling" on whether the government could cross-examine McConnell as to certain matters, on the facts in this case we need only consider so much of the record as will demonstrate whether such a ruling was ever in fact made and the issue properly preserved for appeal.

In January, 1979, appellant James McConnell purchased a natural gas gathering line in Craig County, Oklahoma, and some 10,000 acres of adjacent leases. McConnell's gathering line was connected to a transmission line owned by the Cities Service Gas Company. McConnell and appellant Raymond Starns then formed a partnership, called Wagon Wheel Energy (hereinafter "Wagon Wheel"), to acquire further leases in the area, operate McConnell's line and sell turn-key natural gas wells to investors. The gas from the wells drilled for investors was to be transported through McConnell's line and sold to Cities Service. McConnell and Starns also formed, with two Tulsa real estate promoters, Fox Henderson and Sam Medley (both not charged in this case), the Pyramid Energy Corporation (hereinafter "Pyramid") to solicit investors for Wagon Wheel. In addition, McConnell and Starns directly solicited investors for Wagon Wheel without benefiting Pyramid, apparently in contravention of promises made to Henderson and Medley.

The government alleged that the Canadian and American investors who spent approximately $3.5 million on Wagon Wheel wells were victimized by McConnell and Starns in numerous ways and, for the most

[*] Honorable Luther Bohanon, Northern, Eastern and Western Districts of Oklahoma, sitting by designation.

part, ended up owning uncompleted or otherwise worthless wells. To perpetrate this fraud, McConnell and Starns employed the following devices, among others: they furnished false production information to a petroleum engineer and then used the resulting false engineer's report to lure investors; they paid production royalties when none were due; they had an employee falsify open-flow test charts; and they created a fictitious letter from Cities Service addressed to McConnell which was used to divert investors from obtaining information directly from Cities Service that contradicted McConnell's and Starns' own statements. There was also evidence that on at least one occasion they directed an employee to put dry ice and acid into a well in an unsuccessful attempt to persuade an investor that the well pressure was greater than it actually was.[1] McConnell and Starns also knowingly gave investors false information about the amount of McConnell's and Starns' investment in Wagon Wheel and the manner in which McConnell and Starns were to profit from investments made in the partnership's wells. Although they represented that their economic gain was to be derived from a transmission fee charged for transporting gas from producing wells through McConnell's pipeline and from reversionary interests in the investors' wells, McConnell and Starns in fact diverted more than $1.2 million of the investors' money directly to themselves with the result that many of the wells they did drill became encumbered by liens.

On appeal, McConnell and Starns do not challenge the sufficiency of the evidence produced at trial to convict them of the crimes charged.

## II. McCONNELL'S MOTION FOR SEVERANCE

The appellants were indicted on June 24, 1982. On August 9, 1982, McConnell moved for a severance. His motion was supported by an affidavit from Starns who stated that if the severance was granted and Starns was tried first, he would waive his fifth amendment privilege and give ex-

culpatory testimony at McConnell's trial. The affidavit set forth in some detail the testimony Starns would give. This motion was denied at the August 30 pretrial conference. On October 8, 1982, McConnell renewed his motion and submitted an additional affidavit from Starns indicating that Starns was willing to drop his original requirement that he be tried first and would testify on behalf of McConnell so long as the severance was granted, regardless of the order of the two trials. This renewed motion, too, was denied, on November 12, 1982, three days before trial.

 This court made a detailed summary of its holdings applicable to severance motions in *United States v. Petersen*, 611 F.2d 1313, 1331 (10th Cir.1979), as follows:

It is axiomatic that defendants may be charged jointly in the same indictment where they are alleged to have participated in the same act or series of transactions. Rule 8(b), Fed.Rules Crim.Proc., 18 U.S.C. Defendants charged jointly in such indictments "are not entitled to separate trials as a matter of right." *Bailey v. United States*, 410 F.2d 1209 (10th Cir.1969) *cert. denied sub nom., Freeman v. United States*, 396 U.S. 933, 90 S.Ct. 276, 24 L.Ed.2d 232 (1969). If prejudice either to the Government or a particular defendant is shown by the joinder, the court may, in its discretion, "grant a severance of defendants or provide whatever other relief justice requires." Rule 14, Fed.Rules Crim.Proc., 18 U.S.C. In determining the merits of a motion for severance, the trial court must weigh the prejudice to a particular defendant caused by joinder against the obviously important considerations of economy and expedition in judicial administration. *United States v. Walton*, 552 F.2d 1354 (10th Cir.1977), *cert. denied*, 431 U.S. 959, 97 S.Ct. 2685, 53 L.Ed.2d 277 (1977). Inasmuch as severance is a matter of discretion and not of right, the defendant must bear a heavy burden of showing real prejudice to his case. *United States*

---

1. There was also testimony, however, that the use of dry ice and acid to stimulate well flow

was an accepted and legitimate practice in the natural gas business.

*v. Parnell, supra* [581 F.2d 1374 (10th Cir.1978)]; *United States v. Ready,* 574 F.2d 1009 (10th Cir.1978). A decision to deny separate trials under Rule 14 will not be disturbed on appeal in the absence of an abuse of discretion. *United States v. Eaton,* 485 F.2d 102 (10th Cir. 1973).... "To establish abuse of discretion more is required than that separate trials might have offered a better chance for acquittal of one or more of the accused." *United States v. Knowles,* 572 F.2d 267 (10th Cir.1978). Rather, it must be shown that the joinder of either defendants or offenses causes actual or threatened deprivation to an individual's right to fair trial. *United States v. Butler, supra* [494 F.2d 1246 (10th Cir. 1974)]. Of course, a trial court has a continuing duty to insure that prejudice does not occur, and if it does to sever defendants or offenses. *Schaffer v. United States,* 362 U.S. 511, 80 S.Ct. 945, 4 L.Ed.2d 921 (1960).

With reference to the specific kind of circumstances involved here, that is, where a defendant bases his motion for severance upon a claim that he needs a co-defendant's testimony, an analysis of the cases from several circuits discloses some incongruity with respect to the considerations deemed necessary to the evaluation of such a motion. Considering the cases together, however, the following factors appear relevant: 1) the likelihood that the co-defendant would in fact testify at the movant's severed trial and waive his Fifth Amendment privilege; 2) the significance of the testimony in relation to the defendant's theory of defense; 3) the exculpatory nature and effect of such testimony; 4) the likelihood that the co-defendant's testimony would be impeached; 5) the extent of prejudice caused by the absence of the testimony; 6) the effect of a severance on judicial administration and economy; 7) the timeliness of the motion. *United States v. Parodi,* 703 F.2d 768, 779 (4th Cir.1983); *United States v. Johnson,* 713 F.2d 633, 640–41 (11th Cir. 1983), *cert. denied,* — U.S. ——, 104 S.Ct. 1447, 79 L.Ed.2d 766 (1984); *United States v. Butler,* 611 F.2d 1066, 1071 (5th Cir. 1980), *cert. denied,* 449 U.S. 830, 101 S.Ct. 97, 66 L.Ed.2d 35 (1980); *United States v. Haro-Espinosa,* 619 F.2d 789, 793 (9th Cir. 1979); *United States v. Finkelstein,* 526 F.2d 517, 523–24 (2nd Cir.1975), *cert. denied,* 425 U.S. 960, 96 S.Ct. 1742, 48 L.Ed.2d 205 (1976); *see also* 1 C. Wright, *Federal Practice and Procedure:* Criminal 2d § 225, (1982).

■ In the present case the government concedes that McConnell made a sufficient showing that Starns would likely testify at a separate trial. It also must be admitted that McConnell's motion was timely. Although the original motion filed August 9, 1982, would not have met the initial requirement of a showing of willingness to testify because Starns conditioned his offer of testimony on his being tried first, *United States v. Parodi, supra; United States v. Haro-Espinosa, supra; United States v. Ruppel,* 666 F.2d 261, 268–69 (5th Cir. 1982), *cert. denied,* 458 U.S. 1107, 102 S.Ct. 3487, 73 L.Ed.2d 1369 (1982), McConnell's renewed motion on October 8, 1982, corrected this defect sufficiently in advance of trial.

It may also be granted that Starns' proposed testimony, as evidenced by his affidavit, was at least significant in view of McConnell's theory of defense. Part of the government's case below rested upon circumstantial evidence of a "money trial" from victimized investors through Wagon Wheel and Starns to McConnell. In his affidavit, Starns stated that he

would testify that any money paid to or from Wagon Wheel Energy, Inc.; Wagon Wheel Energy or me to or used by James McConnell were [sic] in payment of good and valuable consideration received and not in furtherance of nor the division of the fruits of the conspiracy and scheme and artifice to defraud alleged in the indictment.

McConnell argues that the trial court's denial of his motion for severance, by depriving him of Starns' testimony, eliminated his only opportunity to refute the government's "money trail" evidence. Starns' affidavit also states that he would deny certain allegations in the indictment that

McConnell made misrepresentations to investors and a petroleum engineer.

While the proffered Starns testimony does purport to be exculpatory, we find that it lacks substance. Starns' testimony that McConnell gave some unspecified "good and valuable consideration" for the money received would be little more illuminating than a simple assertion that McConnell was innocent. Nowhere in either the motions, briefs or affidavits filed in the trial court or the brief submitted on appeal is there any indication of what this "valuable consideration" was. Nor is there any indication of why only Starns could provide evidence of this consideration. McConnell's feeble reference to the fact that the Assistant U.S. Attorney assigned to his case did not deliver any *Brady* material and indicated that the government's investigation did not disclose any witnesses who could give exculpatory testimony for McConnell is totally unpersuasive. It is not the government's job to provide a criminal defendant with his defensive case. It was McConnell's right and responsibility to explain to the trial court why no accountant, no attorney, no broker, no employee of Wagon Wheel, no other person and no document of any kind could substantiate the existence and indicate the nature of the consideration received in exchange for some $600,000 paid to McConnell out of funds received from investors. Even if McConnell had managed to make this explanation, the trial court would be entitled to conclude that Starns' wholly uncorroborated assertions could not have much credibility. Further, even if McConnell had given Starns and Wagon Wheel some valuable consideration and was paid in the investor funds only as a creditor, this would not contradict the charge that he benefited from and was enriched by whatever fraudulent scheme Starns through Wagon Wheel had perpetrated on the investors.

Starns' assertions that McConnell did not make certain misrepresentations would also have little exculpatory value given the government's allegations of numerous instances when McConnell promoted Wagon Wheel using false information and misrepresented facts about himself outside the presence of Starns.

Also affecting the value of Starns' testimony is the strong probability that he would be impeached were he to take the stand. Starns was convicted in federal court on eight fraud counts in November, 1973. Evidence of these convictions would have been admissible for impeachment purposes under Fed.R.Evid. 609. Further, had Starns been tried first as he requested, and had he been convicted, the fact of that conviction would also have been admissible and would have effectively nullified the exculpatory value of his testimony for McConnell. *United States v. Taylor*, 562 F.2d 1345, 1363 (2nd Cir.1977), *cert. denied*, 432 U.S. 909, 97 S.Ct. 2958, 53 L.Ed.2d 1083 (1977).

Based on these considerations, we find the trial court was entirely justified in considering the prejudice caused to McConnell by a denial of severance to be very small and greatly outweighed by the expense and administrative inconvenience of conducting two lengthy trials involving numerous witnesses rather than one consolidated trial. Accordingly, there was no abuse of discretion and the trial court's ruling must be affirmed. *United States v. Petersen, supra.*

### III. THE THREATENED CROSS–EXAMINATION OF McCONNELL

On November 24, 1982, approximately half-way through the government's presentation of its case at trial, both the government and counsel for Mr. McConnell submitted memoranda to the trial court concerning certain evidentiary disputes that were anticipated to arise during the government's cross-examination of McConnell should he decide to take the stand in his own defense.[2] The government stated its intention to question McConnell on three matters. First, it proposed to ask McCon-

---

**2.** McConnell's memorandum also addressed his intended cross-examination of a witness expected to be part of the government's case in chief, but this issue is not before us on appeal.

nell whether he participated in a scheme to defraud the Progress National Bank of Toledo, Ohio, in 1967 and 1968. In fact, McConnell had been convicted of such fraud in 1972 upon a plea of *nolo contendere* but the government asserted that it would not introduce evidence of this conviction, regardless of McConnell's response to the question, both because the conviction was based on a *nolo contendere* plea and because the conviction was beyond the 10-year limitation of Fed.R.Evid. 609(b). Second, the government indicated its intent to ask McConnell whether he participated in a scheme to distribute stolen and counterfeit securities in Florida in 1972. Again the government indicated it would not attempt to contradict a denial by McConnell because his 1974 conviction for this crime was overturned on appeal.[3] Third, the government indicated that it intended to ask McConnell whether he considered himself a master swindler and whether he ever admitted as much to the F.B.I. This proposed question referred to an interview arranged by the Department of Justice at McConnell's request in 1974 while his Florida conviction was pending appeal. McConnell sought to persuade the Department of Justice to recommend to the sentencing judge in the Florida case that McConnell be given probation by offering to furnish information about various other schemes and swindles. During the interview McConnell admitted (or boasted) that he considered himself to be among the top tier of master swindlers in the world. The government indicated to the trial judge below that if McConnell denied making this statement when cross-examined, the government was prepared to rebut the denial with the testimony of the F.B.I. agent who recorded the 1974 admission.

McConnell's memorandum dealt only with the government's anticipated use of his 1974 statement arguing that the statement would be inadmissible because unreliable, relating to events remote in time, excessively prejudicial, made in the context of plea bargaining and made without McConnell's attorney being present.[4] McConnell's memorandum did not state that he would take the stand only if the trial court ruled that the government could not cross-examine as proposed. Indeed, this possibility appears to have been first suggested on December 1, 1982, by *government* counsel who informed the court that they understood McConnell's counsel wanted to know "where he stands before he [McConnell] takes the witness stand." (Tr. Vo. XI, at 153). At that time the court stated "He will know." and indicated that its decision would not be made with a view toward shortening the length of the trial, referring apparently to an anticipated loss of McConnell's testimony. The matter was not mentioned again until December 7, 1982, after the close of the government's case. At that time the court brought the matter up and stated:

> I think I will also tell you this, that as far as the motion that—not really a motion but statements that have been made about the possible cross examination of Mr. McConnell, *I am not going to make a definitive ruling, final ruling at this time.* However, I am leaning pretty strongly to permitting him to ask that question in a proper manner.

(Tr. Vol. XV at 79) (emphasis added). Counsel for the government then recapitulated the three questions he desired to ask in the manner in which he intended to ask them. Court was then recessed. Counsel for McConnell did not at this time or at any time thereafter press the court for a definite and final ruling. Although McConnell on page 54 of his brief on appeal states

---

3. *United States v. Morrow,* 537 F.2d 120 (5th Cir.1976), *cert. denied,* 430 U.S. 956, 97 S.Ct. 1602, 51 L.Ed.2d 806 (1977). McConnell's conviction was reversed because evidence of his 1972 conviction in Ohio was admitted at the 1974 trial despite its *nolo contendere* basis. He was not retried.

4. The record nowhere indicates that McConnell at any time before the trial court challenged the government's proposed questions about the conduct involved in the 1972 and 1974 criminal prosecutions in Ohio and Florida. It is therefore unnecessary for us to consider whatever ruling the trial court made on these two questions despite McConnell's attempt to raise these issues for the first time on appeal.

that "McConnell advised the court that in view of the ruling he would not testify" no such statement appears in the record. The record also does not show that McConnell at any time made an offer of proof informing the court of the substance of the testimony which was to be withheld because of the court's ruling.

This case does not involve a question of the admissibility of evidence of prior convictions under Fed.R.Evid. 609. However, with respect to the defendant's rights and responsibilities in securing an appealable ruling prior to his testimony, we see no reason to distinguish these circumstances. In *United States v. Halbert*, 668 F.2d 489 (1982) this court examined decisions from other circuits regarding the propriety of making a 609 ruling before a defendant takes the stand. Noting cases that show courts have taken a complete range of positions, from making the ruling before trial to postponing it until after the defendant testifies, we said:

> There is a good deal to be said for postponing the ruling until the matter becomes a reality. But to wait until after the testimony is given is to act too late for the defendant to make a decision based on the court's determination as to admissibility. The best approach might be to postpone it until the time of testimony and *if the defendant states positively that he intends to take the stand only if the court rules in his favor*, that is, if the former convictions are ruled inadmissible for the purpose of discrediting or impeaching his testimony, then the judge would be in a position to make an appealable ruling. *It seems desirable, however, that the condition should not be such that the defendant will be allowed to manipulate the court so as to create a legal question notwithstanding that he has no genuine intention to testify.*

> . . . . .

> It goes without saying that an advance ruling runs the risk of being a hypothetical one, and also, it is very difficult for a trial judge to make an evaluation without having heard the defendant's testimony. Nevertheless, most of the courts which

have had to deal with this problem have held that the advance rulings are reviewable.... Most of these courts require that certain steps be taken to minimize the problems. For example, the defense counsel must outline the intended testimony so as to provide the appellate court a basis for determining whether or not the admission of such convictions was erroneous under Rule 609.... Our disposition is to rule that *provided the defendant expresses himself in positive terms as to taking the witness stand, if the convictions are ruled out*, an advance ruling *can* be made. Also, of course, *there should be a positive ruling by the court.*

668 F.2d at 493–94 (citations omitted and emphasis added) The present case fails to meet the standards we expressed in *Halbert* in two respects.

First of all, the trial court never made a positive ruling on the government's request to cross-examine McConnell about his 1974 admissions to the F.B.I. We must take the trial judge at his word when he said "I am not going to make a definitive ruling, final ruling at this time." If McConnell desired to exercise his right under *Halbert* to seek an advanced ruling it was *his* obligation to press for a positive ruling. As the record stands, it appears that after the court expressed what it clearly indicated was only its non-final inclination, defense counsel dropped the matter entirely.

In *United States v. Banks*, 687 F.2d 967 (7th Cir.1982) the defense counsel, before making his opening statement, asked the court for a ruling on a motion *in limine* regarding evidence of the defendant's prior convictions. The court responded by stating "my posture is that I will admit it, but I want to look into the matter further. There is a decision by Judge Swygert I want to go back and read." 687 F.2d at 971. The Seventh Circuit Court of Appeals held that the defendant was not entitled to consider this statement to be a definite ruling and that "thereafter it became incumbent upon defense counsel to renew his motion to obtain a definitive ruling from

which to appeal. Having failed to do so, the defendant failed to preserve the issue for appeal." 687 F.2d at 972. The same reasoning applies here.

Secondly, McConnell did not positively state that he would take the stand if and only if the court ruled in his favor on the government's requested cross-examination. This makes it unclear that McConnell was not merely trying to "manipulate the court so as to create a legal question notwithstanding that he [had] no genuine intention to testify." *Halbert*, 668 F.2d at 493. This problem is aggravated by the complete absence of a record indicating the content of any testimony McConnell desired to give.

Our decision in *Halbert* to allow advance rulings on Rule 609 matters was prompted in part by the persuasive reasoning of the Ninth Circuit in *United States v. Cook*, 608 F.2d 1175 (1979). *Halbert*, 668 F.2d at 494. The *Cook* court's decision to endorse review of 609 rulings made in advance was conditioned upon its prospective holding that failure of a defendant to make the offer of proof and record required by Federal Rule of Evidence 103 "would be construed as abandonment of the issue on appeal." *United States v. Portillo*, 633 F.2d 1313, 1321 (9th Cir.1980); *Cook*, 608 F.2d at 1186.

Rule 103 provides in part as follows:

(a) Effect of erroneous ruling. Error may not be predicated upon a ruling which admits or excludes evidence unless a substantial right of the party is affected, and

. . . . .

(2) Offer of Proof. In case the ruling is one excluding evidence, the substance of the evidence was made known to the court by offer or was apparent from the context within which questions were asked.

In this case the challenged "ruling" by the trial court may most accurately be characterized as one *allowing* certain evidence to be admitted; that is, McConnell's 1974 statement to the F.B.I. Nonetheless, McConnell's complaint, like those of defendants challenging 609 rulings, is that the effect of the ruling was to *exclude* certain evidence, namely, his own testimony. This seems to bring the matter within the purview of Rule 103(a)(2). This interpretation is reinforced by the practical prerequisites for a court to evaluate whether the probative (impeachment) value of government evidence to be admitted on cross-examination is outweighed by the danger of unfair prejudice to the defendant who proposes to take the stand. This balancing consideration is mandated by Rule 403. However, neither a trial nor an appellate court can assess the extent of prejudice that may be occasioned by a ruling allowing certain cross-examination questions if the defendant's decision to testify is not clearly dependent on the court's ruling and if there is not even an outline of the defendant's proposed testimony before the court to provide a foundation for determining whether that testimony in fact has any substantial exculpatory value or significance to the defendant's case.

Upon the present record, it is impossible for us to determine whether the defendant suffered any prejudice to a substantial right, even if we grant, as we do not, that the trial court made a definite ruling on the government's proposed cross-examination. We therefore can find no error on the part of the trial court in this respect. Fed.R. Evid. 103(a).

## IV. STARNS' MOTION FOR SEVERANCE

In *Powell v. Alabama*, 287 U.S. 45, 53, 53 S.Ct. 55, 77 L.Ed. 158 (1932) the Supreme Court stated: "It is hardly necessary to say that, the right to counsel being conceded, a defendant should be afforded a fair opportunity to secure counsel of his own choice." In this case Starns failed to pay the counsel who originally represented him at his indictment, and on July 30, 1982, that attorney moved to withdraw as counsel for Starns. Starns responded to this motion pro se stating that he did not object to the withdrawal and was diligently attempting to find other counsel. The attorney's motion was granted. When Starns appeared at the August 30, 1982, pretrial conference, he still had no counsel, but informed the court that he would hire the

same attorney representing co-defendant McConnell if the court would grant a severance. The court declined to grant a severance but urged Starns to employ counsel immediately. Starns indicated he would obtain a lawyer and would not ask for a continuance of the trial. Subsequently, Starns failed to retain counsel, despite making further assurances to the court and despite a continuance of the trial date of nearly two months granted by the court when Starns failed to obey a show cause order to appear. Finally, at a hearing on October 12, 1982, a month before trial, Starns indicated that unless the court granted a severance so he could retain McConnell's attorney, he would represent himself at trial. He did in fact end up representing himself though the court specifically advised him against that course of action.

McConnell's and Starns' joint appellate brief asserts that:

The court did not make inquiry into his [Starns'] financial condition nor [sic] did not advise him that he need not be indigent to qualify for appointed counsel: one need only be financially unable to obtain counsel.... Starns was not advised of his right to counsel and therefore did not intelligently and voluntarily choose to appear pro se.

These allegations are flatly contradicted by the record. Starns was repeatedly urged by the trial court to obtain counsel. He flatly refused to disclose his assets so the court could determine whether he was entitled to government assistance in preparing a defense, and repeatedly asserted that he had sufficient funds, though he claimed that he did not have sufficient funds for any attorney but the one already representing McConnell. Starns' self-contradictory position on the adequacy of his assets seems to boil down to a belief that he had enough money to hire an attorney, but not enough for one who could be as fully and adequately prepared by the time of trial as he felt McConnell's counsel already was. He also asserted that he thought attorneys who wanted large sums of money up front to represent him were predisposed to believe that he was guilty

and thus were unacceptable. Starns acknowledged that his position might be unreasonable but nonetheless stated that it was his position. It is no wonder that the trial judge at one point remarked "you leave the Court totally in the dark." (Tr. Supp. Vol. IV at 9.)

We have on several occasions noted that the Sixth Amendment right to counsel does not include an absolute right to counsel of one's choice. *United States v. Gipson,* 693 F.2d 109 (10th Cir.1982), *cert. denied,* 459 U.S. 1216, 103 S.Ct. 1218, 75 L.Ed.2d 455 (1983); *United States v. Peister,* 631 F.2d 658 (10th Cir.1980), *cert. denied,* 449 U.S. 1126, 101 S.Ct. 945, 67 L.Ed.2d 113 (1981); *United States v. Weninger,* 624 F.2d 163 (10th Cir.1980), *cert. denied,* 449 U.S. 1012, 101 S.Ct. 568, 66 L.Ed.2d 470 (1980). In *Gipson* we noted that "[t]he right to retain counsel of one's choice may not 'be insisted upon in a manner that will obstruct an orderly procedure in courts of justice, and deprive such courts of the exercise of their inherent powers to control the same.'" 693 F.2d at 111 *quoting United States v. Burton,* 584 F.2d 485, 489 (D.C.Cir.1978) *cert. denied,* 439 U.S. 1069, 99 S.Ct. 837, 59 L.Ed.2d 34 (1979). Here it appears from the record that Starns, by first making repeated assurances to the court that he would obtain counsel and then as the trial date approached, stubbornly resisting any attempt to provide him with an attorney other than the one already employed by McConnell, may have been attempting to manipulate the court into granting a severance, which both he and McConnell desired but were not entitled to on any other basis. We hold that the Sixth Amendment right to counsel does not extend so far that a criminal defendant is entitled to a severance merely because he expresses a preference for an attorney he cannot have any other way.

■ Because Starns carried out his threat to proceed pro se if no severance were granted, this case is a coin with two sides. Having determined that he was not entitled to the severance, we must also determine whether the trial judge adequately insured that Starns' waiver of his right to counsel was "an intentional relin-

quishment or abandonment of a known right or privilege." *Johnson v. Zerbst*, 304 U.S. 458, 464, 58 S.Ct. 1019, 1023, 82 L.Ed. 1461 (1938). The record shows that the trial judge did not strictly follow the test we established in *Weninger*, and reasserted in *Gipson*, for a judge's responsibility in questioning a defendant about his waiver of counsel. The court did not literally inform Starns "of the nature of the charges against him, the statutory offenses included within them, or the range of allowable punishments to which he might be subjected. Nor did the court apprise [him] that possible defenses or mitigating factors might be available to him." *Gipson*, 693 F.2d at 112.[5] Nonetheless, it would be absurd in this case to believe that Starns did not make a knowing and intelligent waiver. The record discloses that he had read the entire indictment and asserted that he understood it; that he had already begun work on his defense and was aware of the witnesses that the government would present and had made plans to call his own; and that he was aware of the seriousness of the penalty he faced. It also reveals that he had attended two and one half years of law school. It is further beyond question that the trial court's repeated efforts to persuade and enable Starns to obtain his own counsel and its detailed discussion of the hazards of proceeding pro se, were by no means a "hollow compliance with the mandate of the Constitution" *Von Moltke v. Gillies*, 332 U.S. 708, 723, 68 S.Ct. 316, 323, 92 L.Ed. 309 (1948). Starns' resistance to these efforts reveals a stubborn, calculated and deliberate insistence on having his own way. Based on "the total circumstances of [this] individual case, including background, experience and the conduct of the accused person," *Weninger*, 624 F.2d at 164 (quoting *United States v. Warledo*, 557 F.2d 721, 727 (10th Cir.1977)); *Johnson v. Zerbst, supra,* we must conclude that there has been no violation of Starns' right to counsel.

The judgment of the District Court is affirmed in all respects.

AFFIRMED.

---

5. Examination of the origins of our *Weninger-Gipson* standard discloses that it is taken from the Supreme Court's opinion in *Von Moltke v. Gillies*, 332 U.S. 708, 723–24, 68 S.Ct. 316, 323, 92 L.Ed. 309 (1948). *See Weninger*, 624 F.2d at 164. *Von Moltke* was a habeas corpus proceeding concerning not only a waiver of counsel but also an uncounseled plea of guilty at an arraignment during which the trial judge apparently made only a token effort to comply with his constitutional mandate to protect the interests of the defendant. It thus appears to be substantially distinguishable from the present circumstances.