**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**July 28, 2014**

**Elisabeth A. Shumaker**
**Clerk of Court**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**

UNITED STATES OF AMERICA,

          Plaintiff - Appellee,

v.

CURTIS L. MORRIS,

          Defendant - Appellant.

No. 12-1474
(D.C. No. 1:10-CR-00317-REB-1)
(D. Colo.)

**ORDER AND JUDGMENT\***

Before **BRISCOE**, Chief Judge, **HOLLOWAY**\*\*, Senior Judge, and **PHILLIPS**, Circuit Judge.

---

    \* This order and judgment is not binding precedent except under the doctrines of law of the case, claim preclusion, and issue preclusion. It may be cited, however, for its persuasive value consistent with Federal Rule of Appellate Procedure 32.1 and Tenth Circuit Rule 32.1.

    \*\* The late Honorable William J. Holloway, Jr., United States Senior Circuit Judge, participated as a panel member when this case was heard but passed away before final disposition. "The practice of this Court permits the remaining two panel judges if in agreement to act as a quorum in resolving the appeal." *United States v. Wiles*, 106 F.3d 1516, 1516 n.[*] (10th Cir. 1997); *see also* 28 U.S.C. § 46(d) (noting circuit court may adopt procedures permitting disposition of an appeal where remaining quorum of panel agrees with the disposition). The remaining panel members have acted as a quorum with respect to this order and judgment.

The evidence at trial proved that Curtis L. Morris played an integral part in a tax-fraud conspiracy. Although complicated in its implementation, the basic premise of the conspiracy's scheme was fairly simple: Morris would claim nonexistent tax withholdings on tax returns, and, ideally for the conspirators, the Internal Revenue Service (IRS) would then pay a refund when the tax withholdings were greater than the tax liability. In all, he fraudulently prepared tax returns that led the IRS to pay out more than $2.2 million in undeserved tax refunds. After the jury convicted him, the district court varied downward and sentenced him to 120 months in prison. Morris now challenges his conviction and sentence. We conclude that the district court committed no error and affirm.

## BACKGROUND

Morris has a bachelor's degree in accounting and had long worked for various businesses as a bookkeeper or accountant. He also operated a side business preparing tax returns for individuals. Through this side business he prepared returns that misused Form 1099-OID to help clients obtain unjustified tax refunds. The IRS requires financial institutions to generate Form 1099-OID if they issue or hold certain investments for their clients. *See generally* I.R.S. Publication 1212, 2013 WL 6859821 (Dec. 20, 2013). In this circumstance, the institutions then send the form to the IRS and also to the taxpayer to enable the taxpayer to report income and income tax withheld from those investments. *Id.* at *12.

Morris fabricated Forms 1099-OID for his clients to deceive the IRS into believing that the forms had originated from various financial institutions. Although these financial

institutions had indeed lent Morris's clients money for mortgages, car loans, and credit cards, they had not held any investment for the clients that required a Form 1099-OID. Despite this, Morris's falsified Forms 1099-OID that reported his clients' outstanding debt with the institutions as income and income tax withheld.[1] Next, he prepared and filed tax returns with the fabricated Forms 1099-OID attached, claiming false tax withholdings.

The scheme worked when the IRS matched the withholdings claimed in the tax returns to the Forms 1099-OID and paid refunds after being fooled into believing that more taxes had been withheld than required. For his services, Morris charged a modest fee, but requested 1% of the refund from two clients and actually received that amount from one of them. In total, Morris prepared Forms 1099-OID and returns for himself and 20–25 clients requesting $21,166,468.00 in refunds. The IRS mistakenly paid $2,299,775.26.[2]

By July 2009 the game was up. An IRS team led by Agent Greg Flynn secured a warrant and searched Morris's house. During the search, Morris agreed to answer Agent Flynn's questions. Agent Flynn asked about Morris's personal use of Forms 1099-OID: "I asked Mr. Morris, Sir, why do you think the Internal Revenue Service owes you $74,000? He replied, 'You don't.'" R. vol. 6, at 1481. Morris admitted that he, not the financial institutions, had prepared Forms 1099-OID and that he lacked authority to do so. He also

---

[1] The basis for Morris's misuse of Form 1099-OID originated with a publication that supposedly supported the questionable theory with historical facts and law.

[2] The IRS was able to recover $382,944.30 of the total amount paid out.

said he'd individually filed his 2008 return with falsified Forms 1099-OID "to keep his wife out of harm's way." *Id.* at 1492. Finally, Morris told Agent Flynn that, although he believed that he was owed the tax refunds, his "preparation of the Forms 1099-OID without the authority of banks or creditors was wrong." *Id.* at 1517.

Eventually, Morris was arrested, and a grand jury returned a 28-count superseding indictment against him and two others—Richard Kellogg Armstrong and Larry Ray Hall. The indictment charged Morris with three counts of mail fraud in violation of 18 U.S.C. §§ 1341 and 2 (counts 1–3), 17 counts of making false claims against a department or agency of the United States in violation of 18 U.S.C. §§ 287 and 2 (counts 6–22), and one count of conspiracy to defraud the government in violation of 18 U.S.C. § 286 (count 28). Armstrong and Hall were similarly charged, but Hall died before trial.

In the ensuing joint trial, the jury convicted both Armstrong and Morris of all counts charged. The district court sentenced Morris to 120 months in prison. Morris now appeals his conviction and sentence. Now we turn our discussion to the facts relevant to his challenges.

## 1. Armstrong's Statements During Trial

Armstrong chose to represent himself at trial. Although he wasn't combative with the district court, he repeatedly made nonresponsive and nonsensical remarks when the court sought his comments as pro se counsel. From the beginning, Armstrong attempted to present some sort of procedural defense to the charges against him. In his opening statement, Armstrong began:

Good morning, ladies and gentlemen of the jury. I conditionally accept these proceedings on proof of claim that I am not here today as the paramount security interest holder in all property and collateral, both registered and unregistered, belonging to Richard Kellogg Armstrong appearing specially, not generally, and on proof of claim that there is not a notice before this Court to continue this public proceedings [sic] pending completion of the ongoing private administrative record which, when completed, will have the likelihood to set off, settle, and resolve this matter without wasting valuable public resources.

I now move this Court to continue these proceedings, these public proceedings, for 60 days to resolve the matter privately. Thank you.

R. vol. 6, at 34.

Armstrong repeated this "proof of claim" mantra when asked for his position on objections and the introduction of evidence. Almost every time Armstrong made a remark of this variety, the court cut him off. Eventually, the court "enjoined and restrained" Armstrong from repeating these comments. *Id.* at 473.

Undeterred, Armstrong continued to bring up "proof of claim" and alleged that the court was forcing him to answer under duress:

Your Honor, so I am not in contempt of court, I conditionally accept on proof of claim I'm not in contempt. I will say whatever you want me to say or do, whatever you want me to do under threat of duress and coercion, and I will sit down and be quiet.

*Id.* at 568. The court addressed Armstrong's behavior outside the hearing of the jury and warned Armstrong that he would be held in contempt if he continued to make irrelevant comments. In all, the court found Armstrong in contempt ten times but never in the jury's presence.

Before trial, Morris had unsuccessfully moved for severance, arguing generally that a pro se codefendant's potential "to commit frequent and serious missteps at trial" would undermine his defense. R. vol. 1, at 310. Morris renewed his severance motion three

times during trial, but the district court denied his repeated requests. In doing so, the court noted the protective measures it had taken to lessen any effect Armstrong's self-representation might have on Morris: the court appointed standby counsel, it advised Armstrong that he would be held to the rules of law and evidence, and it instructed the jury that it couldn't consider as evidence Armstrong's comments while acting as his own attorney.

## 2. Lay Testimony of Armstrong's Accountant

The government called Kenneth Chafin as a lay witness. Chafin had worked as a Certified Public Accountant for 30 years and had prepared Armstrong's taxes for 20 years before Armstrong took his business to Morris. Chafin testified that in mid-December 2008 Armstrong emailed him about using Form 1099-OID to recover debts that the government supposedly owed taxpayers. Armstrong boasted that he had recovered $1.6 million from the IRS using Form 1099-OID and suggested that Chafin adopt the practice as well. Concerned, Chafin sent Armstrong an email explaining why he believed the scheme was illegal and advising Armstrong to return all of the funds. In the email, Chafin warned of potential criminal penalties:

> Regardless of your opinion or interpretation, the courts will authorize the United States to confiscate your assets to repay the funds they sent you and may criminally prosecute you as well. I can guarantee that the Treasury Department will criminally prosecute the promoters of this arrangement and will probably criminally prosecute the accountant who prepared your tax returns.

*Id.* at 1175.

At trial, Chafin testified about this email exchange. He explained that he had decided to warn Armstrong because he had prepared Armstrong's original returns—which Morris later amended and refiled under the Form 1099-OID scheme. He knew of no basis for the claimed refunds. He also testified that he had found nothing supporting the legality of Armstrong's use of Form 1099-OID in IRS publications, and further that the IRS's paying the refunds didn't mean the IRS thought the tax return was correct.

On cross-examination, Chafin acknowledged that a hypothetical taxpayer who in good faith files a tax return and receives a refund is entitled to keep that money until the IRS says otherwise. On redirect, Chafin testified that a tax preparer who knowingly files a false return acts criminally. When asked if being an accomplice to filing a false tax return would be a federal crime, he answered, "You bet." *Id.* at 1205. Chafin testified that he wouldn't have filed the amended returns because he believed them to be "fraudulent return[s]" with no valid support. *Id.* at 1206. Finally, Chafin testified that when he sent the email warning Armstrong of the illegality and potential ramifications of participating in the 1099-OID scheme, he'd seen no "gray area" in the IRS's interpretation that the 1099-OID scheme was illegal. *Id.* at 1209.

### 3. Closing Arguments

One of Morris's defenses was that the IRS had pursued his prosecution out of anger for mistakenly paying out refunds. His counsel began his opening statement as follows: "Mr. Morris sits here today because of the incompetency of the Internal Revenue Service of paying out substantial refunds to individuals who should have been flagged and should

not have been paid." *Id.* at 23. He blamed the prosecution on the IRS's being "mad because something broke down" within the agency. *Id.* at 24.

In closing, Morris argued that the IRS had unfairly targeted him because of its anger at having paid out public funds: "They aren't happy that they used *our money* and paid Mr. Armstrong a lot of money. They're not happy about it." *Id.* at 2127 (emphasis added). He concluded as follows:

> Mr. Morris is not guilty, and despite the fact that the Government is not happy about paying out a lot of money, *our money*, and the fact they may not be able to find his money or some of the other individuals' money, that doesn't mean their anger should be directed toward this defendant and that he's guilty.

*Id.* at 2146–47 (emphasis added).

In rebuttal closing, the government argued that Morris and his complicit clients had ignored reality to rationalize their fraudulent refunds:

> If they get the money . . . they rationalize it and say, you know what? I am owed that money. Just like that case, in this case, if they get the money from the man, they say, you know, it's the IRS. They're a big organization. It's their mistake. They should go after the banks anyway. So they rationalize it that way. They say to themselves, all I did was get one over on the man.
>
> Well, ladies and gentlemen of the jury, the man is you. The man is you. The man is me. The man is all of us. And what these people are doing at the end of the day is trying to get one over on us.
>
> I ask you at this point don't let them do it again. Hold them criminally accountable by doing the only thing you can in this case, speaking with one voice and returning an indictment [sic] holding these defendants accountable. Thank you.

*Id.* at 2159–60.

Four days later—the same day the jury returned its verdict—Morris filed an objection to the government's rebuttal closing, contending that the government had argued "that jurors should take into account the fact that their tax dollars had been misappropriated by

Mr. Morris." R. vol. 1 at 1033. He alleged that this constituted a "naked appeal to the personal interests of the jury" and that the government's statements improperly asked the jury to convict "on the need to protect society rather than the facts of the case." *Id.* at 1033. The court denied this motion because the government's remarks "addressed with precision Mr. Morris's closing argument suggesting that the government prosecuted this case out of a sense of embarrassment or wounded pride with concomitant frustration and anger over its failure to more quickly identify the improper claims of Mr. Morris and his clients, referring in that context to the [IRS's] mismanagement of 'our money.'" *Id.* at 1167.

## 4. Sentencing

The United States Probation Office for the District of Colorado prepared a Presentence Investigation Report (PSR). The PSR calculated a total offense level of 35.[3] This total resulted from a base offense level of 7 together with another 28 levels from four guideline enhancements: 22 levels because the intended loss was over $20 million (U.S.S.G. § 2B1.1(b)(1)(L) (2011)), 2 levels because the offenses involved sophisticated means (§ 2B1.1(b)(10)(C)), 2 levels because Morris used a special skill to commit the offense (§ 3B1.3), and 2 levels because he obstructed justice (§ 3C1.1). With a total offense level of 35 and a criminal history category of I, the advisory guideline range was

---

[3] The PSR included U.S.S.G. calculations based on the 2011 edition. The district court used the 2012 edition to sentence Morris, but only after it found that the relevant provisions were the same and there were no ex post facto issues. We will refer to the 2011 edition when discussing the PSR and the 2012 edition when discussing the court's sentence.

168–210 months for each of counts 1–3, 60 months for each of counts 6–22, and 120 months for count 28.

Morris objected to all of the recommended enhancements except for his use of a special skill. He also requested a downward variance based on the 18 U.S.C. § 3553(a) sentencing factors, and a downward departure based on his belief that the intended loss overstated the seriousness of the crime. *See* U.S.S.G. § 2B1.1 cmt. n.19(C). The district court rejected these objections to the PSR's calculations and also denied a downward departure. Nonetheless, the court did vary downward 48 months based on its belief that the advisory guideline range didn't adequately credit a number of mitigating factors— namely, Morris's lack of a criminal record, his otherwise productive life, and the unlikelihood of his committing more crimes. Ultimately, the court imposed concurrent sentences of 120 months for counts 1–3, 60 months for counts 6–22, and 120 months for count 28.

## DISCUSSION

Morris raises five issues on appeal. First, he claims that the district court abused its discretion by denying his severance motions. Second, he argues that Chafin testified as an expert without having been disclosed or certified as one, and, further, that Chafin improperly testified that Morris was guilty of fraud. Third, he complains that the government committed prosecutorial misconduct during closing argument by "inflaming the passions and prejudice of the jury." Appellant's Br. 29. Fourth, he challenges the procedural and substantive reasonableness of his sentence. And fifth, he claims that these

errors—even if harmless standing alone—denied him a fair trial when considered cumulatively. We address and reject each argument in turn.

## 1. Severance

We review the denial of a severance motion for abuse of discretion. *United States v. Clark*, 717 F.3d 790, 818 (10th Cir. 2013). In considering whether an abuse occurred, we keep in mind the general rule that persons indicted together should be tried together. *Zafiro v. United States*, 506 U.S. 534, 537 (1993); *United States v. Evans*, 970 F.2d 663, 675 (10th Cir. 1992). This rule applies most strongly in conspiracy cases. *United States v. Pursley*, 577 F.3d 1204, 1215 (10th Cir. 2009) ("[W]e recognize a presumption in a conspiracy trial that coconspirators charged together preferably should be tried together."); *Evans*, 970 F.2d at 675. Accordingly, we won't disturb the district court's denial of severance absent a "strong showing of prejudice." *Evans*, 970 F.2d at 675. "Prejudice occurs when there is a serious risk that a joint trial will compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence." *United States v. Edwards*, 69 F.3d 419, 434 (10th Cir. 1995) (internal quotation marks omitted). It isn't enough "that separate trials might have offered a better chance for acquittal of one or more of the accused." *Evans*, 970 F.2d at 675 (internal quotation marks omitted).

Generally, when reviewing a denial of a severance motion, we evaluate the nonexhaustive *McConnell* factors to determine whether a district court has abused its discretion:

1) the likelihood that the co-defendant would in fact testify at the movant's severed trial and waive his Fifth Amendment privilege; 2) the significance of the testimony in relation to the defendant's theory of defense; 3) the exculpatory nature and effect of such testimony; 4) the likelihood that the co-defendant's testimony would be impeached; 5) the extent of prejudice caused by the absence of the testimony; 6) the effect of a severance on judicial administration and economy; [and] 7) the timeliness of the motion.

*United States v. McConnell*, 749 F.2d 1441, 1445 (10th Cir. 1984). But Morris fails to address these factors. *See Clark*, 717 F.3d at 818–19 (affirming a severance denial, in part, because appellant "offer[ed] nothing [under the *McConnell* factors] that would permit us to meaningfully evaluate the district court's severance decision"). Here, the only *McConnell* factor weighing in Morris's favor is his timely moving for severance. But a separate judicial administration factor weighs against him—two lengthy trials wouldn't serve the interest of judicial economy.

Rather than address the *McConnell* factors, Morris argues that the district court abused its discretion, not because of prejudice to a specific trial right, but because Armstrong's repeated legally irrelevant statements denied him a fair trial. He asserts that Armstrong "engender[ed] contempt with the court and also the jury," Appellant's Br. 22, and that the jury undoubtedly traced Armstrong's "aberrant behavior and thinking" back to him, *id.* at 23. The prejudice, in other words, was that "[t]he jury lumped Mr. Morris with Mr. Armstrong as a ridiculous tax protester." *Id.* at 24. He contends that the jury's verdict proves as much because he and Armstrong "were both found guilty of every single charge." *Id.*

We agree with Morris that Armstrong didn't make cogent legal arguments and that he "did nothing to bolster the defense." *Id.* at 22. Perhaps Armstrong even engendered the

contempt or frustration of the jury despite the court's disciplining him outside the jury's presence. But even if Armstrong appeared "ridiculous," it doesn't follow that the jury found Armstrong guilty as a result, and it's even more of a stretch to speculate that the jury somehow found Morris guilty because of his codefendant's efforts. By Morris's own admission, Armstrong's remarks throughout trial were "meaningless," *id.* at 23—they may not have bolstered Morris's defense, but they didn't undermine it. Armstrong never suggested that Morris had committed tax fraud. In fact, Armstrong's courtroom statements never even referred to Morris or the crimes charged against him. In the end, we agree with the district court that Armstrong's conduct, "obstreperous or contumacious as it may have been," didn't prejudice Morris.[4] R. vol. 6, at 888.

The jury's verdict doesn't lead us to a different conclusion. We see strong evidence in the record proving that both Morris and Armstrong were guilty of the crimes charged. Morris implicated himself in the crimes charged when questioned by Agent Flynn during the search of his home. The jury's convicting both Morris and Armstrong of all counts charged doesn't persuade us that the joint trial prejudiced Morris.

---

[4] In this key respect, Morris's challenge resembles those brought by represented defendants against pro se codefendants in *United States v. Cross*, 928 F.2d 1030, 1039–40 (11th Cir. 1994), and *United States v. Tracy*, 12 F.3d 1186 (2d Cir. 1993), both of which Morris cites in his brief. In *Cross*, the appellant failed to explain how his pro se codefendant's comments or testimony implicated him. 928 F.2d at 1039. And in *Tracy*, the court found that prejudice would only have existed if the pro se codefendant had introduced evidence at trial that was inadmissible against the appellant. 12 F.3d at 1194. Morris fails to explain how he has shown prejudice where the similarly situated defendants in *Cross* and *Tracy* didn't.

Finally, the record shows that the district court minimized any prejudice to Morris that may have resulted from Armstrong's self-representation. Apart from silencing and disciplining Armstrong when appropriate, the court gave limiting instructions. *See Zafiro*, 506 U.S. at 540 ("[L]imiting instructions, often will suffice to cure any risk of prejudice."). The court instructed the jury that it could decide the case based only on the evidence, that statements by counsel and Armstrong (including opening statements and closing argument) weren't evidence, and that in reaching separate verdicts the jury was to consider the evidence against each defendant. We presume that a jury follows the instructions of the court. *United States v. Fleming*, 667 F.3d 1098, 1106 (10th Cir. 2011). Accordingly, even if Armstrong's comments were *potentially* prejudicial, they didn't prevent the jury from making a reliable judgment about Morris's guilt. *See United States v. Espinosa*, 771 F.2d 1382, 1398–400 (10th Cir. 1985) (affirming the denials of severance and mistrial motions when a pro se defendant made an opening statement that allegedly incriminated his codefendants because the court gave similar limiting instructions).

### 2. Chafin's Testimony

At trial, Morris objected to some testimony offered by Kenneth Chafin, Armstrong's previous accountant, but failed to object to other testimony now challenged on appeal. For testimony admitted over Morris's objection, we review for an abuse of discretion. *United States v. Brooks*, 736 F.3d 921, 929 (10th Cir. 2013). For testimony first challenged on appeal, we review for plain error. *Id.* at 929–30; *see* Fed. R. Crim. P. 52(b)

- 14 -

("A plain error that affects substantial rights may be considered even though it was not brought to the court's attention."). "Plain error occurs when there is (1) error, (2) that is plain, which (3) affects substantial rights, and which (4) seriously affects the fairness, integrity, or public reputation of judicial proceedings." *Brooks*, 736 F.3d at 930 (internal quotation marks omitted).

Morris attacks Chafin's testimony on four grounds. He contends that (1) Chafin testified in violation of a scheduling order of the district court; (2) the government never disclosed Chafin as an expert in violation of Federal Rule of Criminal Procedure 16; (3) Chafin's opinions lacked foundation under *Daubert*; and (4) "Mr. Chafin cannot opinion [sic] that what Mr. Morris did was fraud as an essential element of the crimes or that if he, Mr. Chafin, did what Mr. Morris did that would amount to a crime," Appellant's Br, 27–28.

We begin by addressing Morris's first three challenges, all of which depend on whether Chafin testified as an expert witness—a point Morris implies but never asserts.[5] According to the district court's scheduling order and Federal Rule of Criminal Procedure 16(a)(1)(G), the government needed to disclose a written summary of testimony and opinions of any expert witness it intended to call in its case-in-chief. Because the government didn't list Chafin as an expert before trial, the district court had no reason to consider the admissibility of expert opinion under *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 592 (1993). Even so, the lack of notice was proper

---

[5] Morris's fourth and final challenge also depends on whether Chafin testified as an expert, but we address that challenge separately.

unless Morris first establishes that Chafin in fact testified not as a lay witness but as an expert.

In three ways, Federal Rule of Evidence 701 sets boundaries on opinion testimony from lay witnesses. *United States v. Contreras*, 536 F.3d 1167, 1170 (10th Cir. 2008). First, the testimony must be "rationally based on the witness's perception." Fed. R. Evid. 701(a). Second, it must be "helpful to clearly understanding the witness's testimony or to determining a fact in issue." *Id.* 701(b). And third, it must *not* be "based on scientific, technical, or other specialized knowledge within the scope of Rule 702." *Id.* 701(c). Rule 702, in turn, governs expert opinion testimony by witnesses with specialized "knowledge, skill, experience, training, or education." Fed. R. Evid. 702. Expert witnesses may give opinion testimony if their expertise will help the trier of fact, if their testimony is based on sufficient facts or data and is the product of reliable principles and methods, and if they have reliably applied those principles and methods to the facts of the case. *Id.*

Morris doesn't explain how Chafin's testimony exceeded the scope of Rule 701, nor does he precisely identify the opinions he challenges. Over three pages in his briefing, Morris merely recites Chafin's various opinions and concludes that "[t]here are numerous problems here"—the first three of which all relate to whether Chafin's testimony exceeded the scope of Rule 701. Appellant's Br. 27. Without any clarification from Morris, we are left to review the several pages of testimony that Morris cites to see whether the testimony complied with Rule 701 generally. Having done so, we find no abuse of discretion by the district court.

Three times the district court overruled Morris's objections to Chafin's testimony now challenged on appeal.[6] First, the district court overruled Morris's objection when the government asked Chafin if there was "any basis in what [he'd] seen written by the IRS about these 1099-OIDs that supports [Armstrong's] view?" R. vol. 6, at 1169. Chafin responded, "Absolutely not." *Id*. at 1171. Second, the district court overruled Morris's objection when the government asked about "the significance of the IRS paying a large refund" or, more precisely, whether he thought "that signif[ied] that the return that's used as a vehicle to get the refund is approved and correct?" R. vol. 6, at 1184. Chafin again responded, "Absolutely not." *Id.* at 1185. And third, the court overruled Morris's objection when the government asked, "When you formulated your response to Mr. Armstrong's email explaining to you how he was using the OID program, had you seen any gray areas with the IRS's position on that?" *Id*. at 1207. Chafin responded, "No." *Id*. at 1207, 1209.

Notably, Morris doesn't challenge the admission of Chafin's emails warning Armstrong that his use of Form 1099-OID was illegal. From our perspective, the challenged testimony communicated little more than did the emails themselves. Moreover, we think the opinions Morris challenges were based on Chafin's first-hand perceptions as Armstrong's tax preparer of 20 years, not on his specialized accounting

---

[6] The second of these objections had nothing to do with Rule 701 or 702 and we therefore doubt that Morris properly preserved the issue for appeal. *See United States v. Mendoza-Salgado*, 964 F.2d 993, 1008 (10th Cir. 1992) ("On appeal, the specific ground for reversal on an evidentiary ruling must mirror the objection raised at trial."). Still, we need not apply the more demanding plain-error standard because Morris isn't entitled to relief even when we review for abuse of discretion.

knowledge. *See Ryan Dev. Co., L.C. v. Ind. Lumbermens Mut. Ins. Co.*, 711 F.3d 1165, 1171 (10th Cir. 2013) (citing *First Annapolis Bancorp, Inc. v. United States*, 72 Fed. Cl. 204, 207 (2006) ("[A] lay witness accountant may testify on the basis of facts or data perceived in his role as an accountant based on his personal knowledge of the company.")). The government's questions asked Chafin to explain his thinking in drafting the warning emails to Armstrong and to shed light on whether Armstrong knew that the scheme was illegal. Fed. R. Evid. 701(a), (b).

Admittedly, the government proceeded to elicit more general testimony about Armstrong's conduct as it related to tax law—questions that arguably called for opinions beyond the experience of a lay witness. For example, the government asked Chafin if the concept of tax withholding was difficult for tax preparers to understand and to explain the IRS's position about taxpayer refunds through use of Forms 1099-OID. In both of these instances, however, Morris objected and the government withdrew its questions. The district court sustained the balance of Morris's objections to Chafin's testimony without exception.[7] In fact, the court went out of its way to exclude certain testimony under Rule

---

[7] The district court sustained objections to the following specific questions:

- Had Chafin's colleagues expressed a misunderstanding of the basic concept of income tax withholdings?
- Why Chafin had no interest in getting involved with Armstrong's OID arrangement?
- Was it a federal crime to be an accomplice to filing a false tax return?
- Was there anything gray in Chafin's view about what Armstrong was doing in getting refunds through OID forms?
- Did the IRS treat Armstrong's Form 1099-OID interpretation as a gray area?
- What remedies did a taxpayer have when he disagreed with the IRS?

701 even though Morris didn't object on that ground. On this record, Morris can't successfully argue that the district court abused its discretion. And Morris's challenges to the admission of testimony to which he didn't object fail because he doesn't explain how he satisfies the four prongs of the plain-error standard.

We turn now to Morris's argument that "Mr. Chafin cannot opinion [sic] that what Mr. Morris did was fraud as an essential element of the crimes or that if he, Mr. Chafin, did what Mr. Morris did that would amount to a crime." Appellant's Br. 27–28. With this challenge, Morris attacks two portions of Chafin's testimony: (1) that it would be a federal crime for a taxpayer to file a false return, and that a tax professional could also face criminal consequences for preparing false returns; and (2) that Chafin wouldn't have filed Armstrong's amended returns because he thought they were "fraudulent" and incorrect on their face. R. vol. 6, at 1206. As to the first portion, Morris objected only to the final question and answer in that section of testimony: "Is that a federal crime? [Chafin:] You bet." *Id.* at 1205. The district court sustained that objection. As to the second portion, Morris didn't object.[8] Morris asserts that this testimony was directed at "the ultimate issue" in the case—"namely, that he is guilty of a crime [sic] fraud"—and was therefore improper no matter "whether it is lay or expert opinion." Appellant's Br. 27.

---

[8] We review this second portion of Morris's challenge for plain error. *Brooks*, 736 F.3d at 929–30. Even if Morris had properly objected, we would affirm under either standard of review.

Morris challenges this aspect of Chafin's testimony by comparing it to testimony disallowed in *United States v. Banks*, 262 F. App'x 900 (10th Cir. 2008). There, the district court had allowed lay testimony from a police officer about his training and experience in investigating drug-trafficking and about the opinions he had reached about the presence of items found in Banks's apartment. *Id*. at 906. The *Banks* court concluded that the police officer's testimony exceeded the scope of Rule 701 because it was based on specialized knowledge. *Id.* at 907. The court also took issue with the officer's testimony that "Banks, was most definitely distributing illegal methamphetamine for the purpose of obtaining money." *Id.* at 903. The court observed that "[e]ven if Officer Kelley had been qualified as an expert and the expert disclosure requirements were satisfied, it still would have been error to allow him to testify Banks was 'most definitely' guilty of drug trafficking." *Id.* at 907. According to our ruling in *Banks*, expert testimony of this variety violates Rule 704(b) and also usurps the function of the jury. *Id*. at 907–08.

Because we have already determined that Chafin's testimony didn't violate Rule 701, Morris's best argument stemming from *Banks* is that Chafin's testimony violated Rule 704(b). But this argument also fails because Chafin testified as a lay witness and Morris doesn't effectively argue otherwise. Rule 704 only prohibits certain expert opinions about "whether the defendant did or did not have a mental state or condition that constitutes an element of the crime charged or of a defense." Fed. R. Evid. 704(b). The rule doesn't prohibit lay witnesses from testifying about a defendant's mental state, or any other "ultimate issue." *United States v. Goodman*, 633 F.3d at 968–69 (10th Cir. 2011).

Accordingly, Chafin's opinions simply don't fall within the scope of Rule 704(b), unlike the testimony in *Banks*.

Morris nonetheless says that lay witness testimony can improperly extend to an ultimate issue when the witness testifies as a "thirteenth juror." Appellant's Br. 28–29. We will accept this much for the sake of argument, but we can't accept that Chafin usurped the role of the jury here. Unlike the police officer in *Banks*, Chafin didn't testify as to Morris's guilt. He merely testified that he believed it was illegal to falsify tax documents. We think this testimony was helpful to the jury, even if it stated the obvious. *See United States v. Parris*, 243 F.3d 286, 289 (6th Cir. 2001) (upholding a lay witness's characterization of a scheme as "illegal" considering that the defendant "offered prospective customers the opportunity to have their income tax obligations completely eliminated"). What's more, Chafin didn't explicitly tie Morris to the scheme or speculate as to Morris's probable guilt or mental state.[9] *Cf. United States v. Anderskow*, 88 F.3d 245, 250–51 (3d Cir. 1996) (finding a violation of Rule 701(b)'s helpfulness requirement where the lay witness directly testified that the defendant "must have known" about the alleged fraud). Instead, those inferences were left where they belong—with the jury. *See United States v. Richard*, 969 F.2d 849, 854–55 (10th Cir. 1992) (upholding lay testimony that implied the defendants' *mens rea* but didn't "expressly draw that [ultimate]

---

[9] For this reason, even if we were to find that Chafin testified as an expert, we would still conclude that his testimony didn't violate Rule 704(b)'s proscription against "mental state" opinions.

conclusion or inference for the jury"). After reviewing Chafin's testimony, we can't find an abuse of discretion, let alone any plain error.

In any event, Morris's alleged errors wouldn't warrant reversal even if we were to find violations of Rules 701 or 704(b). The evidence of Morris's guilt was overwhelming, especially considering his statements to Agent Flynn during the search of his home. We are convinced that if any error stemmed from Chafin's testimony, it didn't substantially influence the outcome of Morris's trial. *See United States v. Toombs*, 713 F.3d 1273, 1278 (10th Cir. 2013). We would still reach the same ultimate conclusion as *Banks*—that any error was harmless.[10] *Banks*, 262 F. App'x at 908.

## 3. Prosecutorial Misconduct

Morris claims that the government's closing argument was improper. He challenges the following remarks the prosecutor made about Morris and Armstrong and their view of the IRS:

> If they get the money . . . they rationalize it and say, you know what? I am owed that money. . . . they say, you know, it's the IRS. They're a big organization. It's their mistake. They should go after the banks anyway. So they rationalize it that way. They say to themselves, all I did was get one over on the man.
> Well, ladies and gentlemen of the jury, the man is you. The man is you. The man is me. The man is all of us. And what these people are doing at the end of the day is trying to get one over on us.

---

[10] Because portions of Morris's challenge to Chafin's testimony are subject to plain error, he bears the burden of showing that any error was not harmless—i.e. that it affected his substantial rights. *See United States v. Gonzalez-Huerta*, 403 F.3d 727, 736 (10th Cir. 2005) ("[P]lacing the burden on the appellant is one of the essential characteristics distinguishing plain error from harmless error."). But his briefing never addresses any aspect of plain error, and he didn't file a reply brief when the government asserted that standard applied.

R. vol. 6, at 2159–60. With these comments, Morris contends the government implied that everyone, including the jury, was "the man" Morris and Armstrong meant to defraud. This, he says, inflamed the passion of the jurors and invited them to decide the case based on pecuniary or personal interest rather than the evidence. In his view, the comments were so improper that they affected the fairness of his trial and warrant reversal.

We review this challenge for plain error because Morris didn't contemporaneously object to the prosecutor's statements.[11] *See United States v. Taylor*, 514 F.3d 1092, 1095 (10th Cir. 2008). When, as here, a defendant fails to object to a prosecutor's statement, "reversal is warranted only when: [(1)] the prosecutor's statement is plainly improper and (2) the defendant demonstrates that that the improper statement affected his or her substantial rights." *United States v. Anaya*, 727 F.3d 1043, 1053 (10th Cir. 2013) (internal quotation marks omitted). Applying these principles, we find no cause for reversal here.

In this case, the prosecutor drew a connection between the IRS and taxpayers. In doing so, the prosecutor implied that stealing from the IRS, "the man," amounted to stealing from everyone—the jury included. Potentially, these general types of comments could be improper. *See, e.g.*, *United States v. Palma*, 473 F.3d 899, 902 (8th Cir. 2007) ("Remarks invoking the individual pecuniary interests of jurors as taxpayers are universally viewed as improper.").

---

[11] Morris instead filed a written objection four days later—the same day the jury returned its verdict. Raising an objection four days later is four days too late to qualify as timely. *Cf. Miller v. Mullin*, 354 F.3d 1288, 1294–95 (10th Cir. 2004) (approving of the Oklahoma appellate court's plain-error review when the habeas corpus petitioner had made a "belated" prosecutorial-misconduct objection after the case had been submitted to the jury).

However, "we must view the statement in context." *Fleming*, 667 F.3d at 1105. Considering the government's statements in context here persuades us that they weren't improper. Importantly, twice in his closing argument—which of course preceded the government's rebuttal argument referencing "the man"—Morris blamed the IRS for any mistaken use of "our money." R. vol. 6, at 2127, 2146. In a sense, Morris himself sought to inflame the passions of the jury against the IRS because the IRS had lost taxpayer dollars—"our money"—i.e. the jury's dollars too. Morris can't now fault the government for arguing that he was to blame for this same communal loss.[12] *See United States v. Young*, 470 U.S. 1, 12 (1985) ("[T]he reviewing court must not only weigh the impact of the prosecutor's remarks, but must also take into account defense counsel's opening salvo."). In cases where the defendant first broaches a topic, we afford prosecutors considerably more latitude. *Fleming*, 667 F.3d at 1105.

Alternatively, even had the prosecutor gone too far, we don't believe his comments affected the outcome of trial or otherwise amounted to unfair prejudice. *United States v. Olano*, 507 U.S. 725, 735 (1993) ("Normally . . . the defendant must make a specific showing of prejudice to satisfy the 'affecting substantial rights' prong of Rule 52(b)."). It would surprise no jury to learn that IRS refunds consist of taxpayer dollars—and that fraudulently obtaining refunds depletes tax revenues. Finally, the evidence at trial

---

[12] At other points in trial, the jury learned that Morris and Armstrong's justification for using Forms 1099-OID to claim refunds rested on the theory that the IRS held money that rightfully belonged in the hands of United States citizens. We think the prosecutor's closing argument also responded to this notion that Morris and Armstrong were simply taking their due; the prosecutor's comments pointed out that taxpayer dollars are intended to serve the public.

overwhelmingly showed that Morris knew his claimed refunds were unjustified. Nothing about the prosecutor's statements require reversal.

## 4. Sentencing

"On appeal, the district court's sentence is reviewed for reasonableness under an abuse-of-discretion standard." *Peugh v. United States*, 133 S. Ct. 2072, 2080 (2013). Sentencing review proceeds in two steps. First, we examine whether the court committed procedural error. *United States v. Lente*, 647 F.3d 1021, 1030 (10th Cir. 2011). This step includes reviewing the district court's Guidelines calculation—in that process, legal conclusions are reviewed de novo and factual findings for clear error. *United States v. Kristl*, 437 F.3d 1050, 1055 (10th Cir. 2006) (per curiam); *see United States v. Fonseca*, 473 F.3d 1109, 1112 (10th Cir. 2007) (analyzing a challenge to the denial of a downward departure as procedural error). When reviewing a court's application of sentencing enhancements, "we view the evidence and inferences therefrom in the light most favorable to the district court's determination." *United States v. Mozee*, 405 F.3d 1082, 1088 (10th Cir. 2005).

Second, "[a]ssuming that the district court's sentencing decision is procedurally sound," we turn to substantive reasonableness, which we review for an abuse of discretion. *Gall v. United States*, 552 U.S. 38, 51 (2007). The sentence must fall within the range of permissible choice. *United States v. McComb*, 519 F.3d 1049, 1053 (10th Cir. 2007). "The court of appeals may, but is not required to, presume that a within-Guidelines sentence is reasonable." *Peugh*, 133 S. Ct. at 2080. We have held that this

rebuttable presumption applies to below-Guidelines sentences as well. *United States v. Balbin-Mesa*, 643 F.3d 783, 788 (10th Cir. 2011).

*Procedural Reasonableness.* Procedural error "relates to the method by which the sentence is calculated," including calculating the Guidelines range. *Lente*, 647 F.3d at 1030 (internal quotation marks omitted). Morris claims that the district court incorrectly calculated his Guidelines range by erroneously applying enhancements for (1) his intended amount of loss, (2) his using sophisticated means, and (3) his obstructing justice. We address each challenge in turn.

First, after finding that the offense involved more than $20 million in intended losses, the district court applied a 22-level enhancement under U.S.S.G. § 2B1.1(b)(1)(L) (2012). Morris argues that he shouldn't have been sentenced based on intended losses but instead only on actual loss. Morris also claims that the IRS itself caused any losses by not immediately detecting his "ridiculous" scheme. Appellant's Br. 36. Morris not only believes that he should have been sentenced on actual loss, but that he also deserved a downward departure under § 2B1.1 application note 19(C), which provides that downward departures may be warranted where the calculated offense level "overstates the seriousness of the offense."

We reject Morris's contention that the district court should have calculated his sentence based on actual loss. Section 2B1.1 application note 3(A) specifically defines loss as "the greater of actual or intended loss." Here, it is undisputed that the intended loss was $21,166,468.00. Accordingly, the court correctly applied the 22-level enhancement based on intended loss. We also reject Morris's request to apply the "zero

loss rule" because—regardless of his claim that the IRS should have stopped him sooner—it is beyond debate that his scheme caused actual loss, which precludes the rule's application. *See United States v. Flanders*, 491 F.3d 1197, 1217–18 (10th Cir. 2007).

Furthermore, we lack jurisdiction to consider Morris's argument that the circumstances of his case warranted a downward departure. *See Fonseca*, 473 F.3d at 1112. "[T]his court has no jurisdiction to review a district court's discretionary decision to deny a motion for downward departure on the ground that a defendant's circumstances do not warrant the departure." *Id.* (internal quotation marks omitted). Here, the district court did just that: "I decline to exercise my authority to depart downward because the circumstances of Mr. Morris do not warrant such a downward departure." R. vol. 6, at 2215. We may review a denial only if a district court interprets "the Guidelines as depriving it of the legal authority to grant the departure." *Fonseca*, 473 F.3d at 1112. Here, the district court recognized its authority. Therefore, we lack jurisdiction to review the denial of the downward departure for procedural reasonableness.[13] *See United States v. Angel-Guzman*, 506 F.3d 1007, 1017–18 (10th Cir. 2007) (citing *Fonseca* in declining to review a procedural-error challenge to a downward-departure denial).

Second, the district court applied a two-level enhancement because the offense involved "sophisticated means" under U.S.S.G. § 2B1.1(b)(10)(C). Sophisticated means

---

[13] We do, however, have jurisdiction to consider "the defendant's asserted grounds for departure when reviewing the sentence for [substantive] reasonableness." *United States v. Chavez-Diaz*, 444 F.3d 1223, 1229 (10th Cir. 2006). As discussed below, we are convinced that the district court's sentence wasn't substantively unreasonable in any aspect, let alone because of the amount of loss.

are "especially complex or especially intricate offense conduct pertaining to the execution or concealment of an offense." § 2B1.1 cmt. n.9(B). Morris argues that the Form 1099-OID scheme was simple and that it amounted only to inflating the income tax withheld.[14]

We disagree. From start to finish, the mechanisms by which Morris defrauded the IRS were intricate. *United States v. Weiss*, 630 F.3d 1263, 1279 (10th Cir. 2010) ("The Guidelines do not require every step of the defendant's scheme to be particularly sophisticated"; rather, the enhancement focuses on the complexity of the whole scheme.). As the district court found, Morris used his specialized knowledge of the IRS to fabricate Forms 1099-OID from various financial institutions, creating an impression that his customers held investments subject to withholdings. He then used those forms to back up amended returns in which he had falsely claimed income tax withheld in amounts matching his customer's debts. The court also found that Morris took a number of steps to avoid the IRS's detection or discovery of the millions of dollars in fraudulent refunds. He carefully selected depository banks and instructed his customers to limit the amounts of their withdrawals. Viewing the conspiracy as a whole, we agree with the district court's finding that the complexity of the Form 1099-OID scheme supported the application of the sophisticated-means enhancement.

---

[14] Morris also claims he was a victim of "double counting" because the district court applied two-level enhancements for sophisticated means under § 2B1.1(b)(10)(C) and for using a special skill to carry out the scheme under U.S.S.G. § 3B1.3. But, as the government points out, Morris fails to develop this argument—it consists of one sentence without legal citation or any indication that it was raised below—subjecting it to waiver in this court. *McKissick v. Yuen*, 618 F.3d 1177, 1189–90 (10th Cir. 2010).

Morris cites *United States v. Ambort*, 405 F.3d 1109 (10th Cir. 2005), and attempts to distinguish it from his case even though he admits *Ambort* is "strikingly similar." Appellant's Br. 38. But that case lends him no support—the striking similarities between that case and the one before us almost necessitate that the district court correctly applied the sophisticated-means enhancement. *Ambort*, a case involving various convictions related to filing false tax returns, enforced the sophisticated-means enhancement because the defendant (1) had created a program teaching history and case law for participants to use when called upon to justify a fraudulent refund; and (2) had instructed the participants how to falsify portions of their tax returns to evade detection. *Id.* Here, Morris told clients that they were entitled to erroneous refunds and backed that claim up with a bogus publication supposedly based on historical facts and law, and he falsified Forms 1099-OID that accompanied the tax returns. Morris fails in his attempt to distinguish his case from *Ambort* because the findings that supported the enhancement there are found here as well.

Third, the district court applied a two-level enhancement for obstruction of justice under U.S.S.G. § 3C1.1. Directing "another person to destroy or conceal evidence that is material to an official investigation or judicial proceeding" or attempting to do so qualifies as an obstruction of justice. § 3C1.1 cmt. n.4(D); *United States v. Rowlett*, 23 F.3d 300, 306 (10th Cir. 1994), *overruled on other grounds by United States v Goff*, 314 F.3d 1248, 1249–50 (10th Cir. 2003). Morris doesn't deny that he told one of his Form 1099-OID clients to "delete all of your e-mails"—i.e., all emails addressed to or from Morris. R. vol. 6, at 413. Rather, he claims that this act of obstruction didn't amount to a

material hindrance to the investigation because law enforcement recovered almost all of the client's emails anyway.

We disagree with Morris's reading of the Guidelines commentary. In the context of an obstruction-of-justice enhancement, the material-hindrance requirement only applies when the obstruction is *contemporaneous* with arrest. § 3C1.1 cmt. n.4(D); *see Rowlett*, 23 F.3d at 306 (interpreting an earlier but identical version of § 3C1.1 cmt.4(D) to allow a non-contemporaneous enhancement "regardless of whether actual hindrance to an official investigation or prosecution results"). Here, the obstruction wasn't contemporaneous with arrest. The IRS searched Morris's home on July 1, 2009. That same day, Morris instructed his client to destroy emails and to tell another person to do so, too. Morris wasn't arrested until June 2010—nearly a full year later. Therefore, the degree of hindrance is irrelevant; all that matters, as the district court found, is that Morris attempted to obstruct the investigation. The court correctly applied the obstruction enhancement.

*Substantive Reasonableness.* To determine a sentence's substantive reasonableness we consider its length given the case's circumstances and the § 3553(a) factors. *United States v. Chavez*, 723 F.3d 1226, 1233 (10th Cir. 2013). We may presume that below-Guidelines sentences are reasonable, and we do so here. *Peugh*, 133 S. Ct. at 2080; *Balbin-Mesa*, 643 F.3d at 788. Morris has failed to rebut that presumption as he must.

In attacking the substantive reasonableness of his sentence, Morris confines his argument to the 18 U.S.C. § 3553(a) sentencing factors. While he admits that the need to

deter criminal conduct was a factor weighing against him, he claims that all of the other § 3553(a) factors weighed in his favor.

This argument does little to rebut our presumption of reasonableness. At sentencing, the district court not only spoke of the need to deter other tax protestors, but it also relied heavily on the nature and characteristics of the offense. *See* § 3553(a)(1). In finding Morris's crimes especially serious, the court noted that Morris was instrumental in the scheme and that he knowingly participated in the scheme for personal financial gain. The serious nature of the crime and Morris's flagrant disrespect for tax laws arguably would have justified a greater sentence, but the district court nonetheless granted a generous downward variance. Again, the advisory guideline range was 168–210 months in prison, but the district court varied downward by 48 months to 120 months. In doing so, the court considered the very things Morris says the court apparently didn't consider well enough—including his law-abiding past and the unlikelihood that he would commit more crimes. Under the circumstances, we can't fault the district court's sentencing.[15]

---

[15] Since there aren't "two or more" instances of harmless error, we don't need to consider Morris's cumulative error argument. *See United States v. Harlow*, 444 F.3d 1255, 1269 (10th Cir. 2006).

CONCLUSION

For the reasons discussed, we affirm Morris's conviction and sentence.


Entered for the Court


Gregory A. Phillips
Circuit Judge